IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MELVIN RUSSELL "RUSTY" SHIELDS, MICHAEL SIMS and SAM STAFFORD,<br><br>　　　　Defendants. | No. CR12-00410<br><br>(CORRECTED) ORDER ON MOTIONS FOR ACQUITTAL OR NEW TRIAL<br><br>[Docket Nos. 230, 231, 232, 233 and 268] |

　　　　Defendant Melvin "Rusty" Shields has filed several motions for acquittal and, in some cases, alternatively, for a new trial, as a result of his conviction on thirty-two counts charging fraud in connection with the business of S3, a real estate development firm in which he and his co-defendants, Michael Sims and Sam Stafford, were the principals. Prior to trial, Stafford pleaded guilty pursuant to a plea agreement to one count of conspiracy to commit bank fraud and wire fraud. Sims went to trial with Shields but was only convicted of two counts of wire fraud. Sims did not file a motion for acquittal or for a new trial.

　　　　The court has considered the briefs and oral arguments of the parties and denies Shields' motions as set forth below.

　　**I. S3 and the Roles of its Principals**

Order on Motions for Acquittal or New Trial
CR-12-00410

S3 Partners was a real estate investment company that had grandiose and optimistic plans for the development of several major real estate projects. S3 formed a separate limited partnership or LLC for each of its projects. S3 sought investors for these projects and promised to pay a significant return on the investment in a short period of time (e.g. 18 months). The promised return was sometimes evidenced by a promissory note. Shields' role in S3 Partners involved financial control over the accounts and the management of investor money. He dealt with banks regarding loans for acquisition and development of the projects. Sims was primarily charged with soliciting investors and depended primarily upon Shields for information about the individual projects and how investors' funds would be used. Stafford was primarily responsible for project development and also provided information concerning the projects to Sims. Although Shields was not heavily involved with the direct solicitation of funds for the projects, he provided financial information to pass onto investors and placed pressure on Sims to obtain funds as he needed more funds for the various S3 projects.

By October of 2007 the relationship between Sims and Shields had soured. The relationship between Shields and Stafford deteriorated in 2008 and S3 eventually ceased operations. Unfortunately, S3 failed as a result of a combination of the crash of the real estate market, lack of appropriate controls and management of its projects, unrealistic goals and, a belief, at least by Shields, that he could use the investors' funds as he saw fit without regard to the project for which they were invested. He apparently initially thought that all the projects would be so successful that everyone would end up being paid and it was not necessary to carefully control the use of funds or to segregate project accounts. Unfortunately, with the crash of the market and the improper use of funds, the projects all failed and the investors received minimal or no returns on their investments.

**II. Motion for a Judgment of Acquittal on Counts 27, 28, 34 and 35 (Docket No. 230)**

Defendant Shields moves for a judgment of acquittal on Counts 27, 28, 34, and 35, which charge bank fraud under 18 U.S.C. § 1344, aiding and abetting bank fraud under 18 U.S.C. § 2, making of false statements to a financial institution under 18 U.S.C. § 1014 and aiding and abetting the making of false statements under 18 U.S.C. § 2. These four counts specifically allege that draw requests supported by fraudulent invoices were submitted to First Savings Bank in Las Vegas on

August 4, 2008 and September 25, 2008 (Exhibits 306 and 307, respectively). Shields claims that Stafford admitted that he created and submitted these fraudulent draw requests to First Savings Bank on his own, without direction from Shields, and that Shields was not connected to the invoices. Shields further contends that his relationship with Stafford had deteriorated and that they could not be considered co-schemers as of the dates of the draws in August and September 2008. In addition, Shields asserts that the draw requests were made on behalf of Alaris Development, a development company run by Stafford and which had taken over the Stagecoach project, and that any funds received from First Savings Bank in connection with these invoices went into an Alaris account.

In considering a motion for acquittal under Fed. R. Crim. P. 29, the evidence must be viewed in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009). Here the evidence is sufficient to support Shields' guilt of Counts 27, 28, 34 and 35. The evidence viewed in the light most favorable to the prosecution shows that in late 2007 and early 2008 Shields initiated the idea of submitting draw requests to S3's lenders based upon construction improvements which were falsely represented as having been completed but was unsuccessful in getting Scott Flowers, S3's Chief Financial Officer at the time, to submit such draw requests. Shields, however, was successful in persuading Stafford to do so both with respect to the Oakmont property and the Stagecoach project. Although the relationship between Shields and Stafford had become strained by the time of the August 4 and September 25, 2008 submissions to the First Savings Bank, Shields was still involved in the Stagecoach project including continuing contact concerning leasing activities and the preparation of accounting materials for the preparation of tax returns. *See, e.g.*, Exhibits 132, 752, testimony of Hayden. Shields did not voice disapproval of the practice of submitting false draw requests or in any way suggest that Stafford should not do so. Even if Shields did not know of the specific requests made by Stafford in the August 4, 2008 and September 25, 2008 draw requests, he had not made any effort to stop the practice he instigated. A rational juror could have found beyond a reasonable doubt that Shields had not withdrawn from the conspiracy with Stafford to commit bank fraud. Therefore, judgment of acquittal on Counts 27, 28, 34 and 35 pursuant to Fed. R. Crim. P. 29

is denied. In addition, vacation of the verdicts on these counts and a new trial is not required by the interests of justice. *See* Fed. R. Crim. P. 33.

### III. Motion for a Judgment of Acquittal on Count 1, Conspiracy (Docket No. 231)

Defendant Shields moves for a judgment of acquittal on Count 1 which charges him with conspiracy to commit wire, mail and bank fraud in violation of 18 U.S.C. § 1349. He does not specify the grounds for the motion. However, his later filed "Post Trial Motions" reference Count 1 in connection with his claim of inadequacy of the court's "unanimity" instructions. The court addresses that alleged inadequate instruction below.

### IV. Motion for Judgment of Acquittal on Counts 15-21, Wire Fraud (Docket No. 232)

Defendant Shields moved for a judgment of acquittal on Counts 15-21 during trial. He was found not guilty of Counts 18, 19 and 21. Count 20 was dismissed and not presented to the jury. Therefore, the court only needs to address defendant's argument that the wire fraud Counts 15-17 lack sufficient evidentiary support. Count 15 relates to an e-mail allegedly sent by Shields on June 9, 2008 entitled "Stagecoach response to letter received today" (Ex. 66/Ex. 14); Count 16 concerns an e-mail allegedly sent by Stafford on September 19, 2008 entitled "Investor update" (Ex. 135); and Count 17 involves an e-mail allegedly sent by Stafford on November 26, 2008 entitled "Financial Report" (Ex. 21).

Defendant Shields argues that the wire transfers in Counts 15-17 were made months after the last investment in Stagecoach and, therefore, were not "sufficiently closely related" to the illegal scheme such that they furthered its accomplishment. *See United States v. Lazarenko*, 564 F. 3d 1026, 1036 (9th Cir. 2009). An essential element of mail or wire fraud is that the mailing must somehow work "in furtherance" of the scheme. *See United States v. Keon*, 982 F.2d 1101, 1107 (7th Cir. 1992). A mailing that, from a theoretical or factual point of view is too remote from the defendant's scheme, will not support a conviction. *Id.* A key question is whether the electronic communication furthers the illegal scheme. *Id.* A communication that actually puts the defrauded person on notice of the fraud, makes the execution of the fraud less likely, opposes the scheme, or discloses the nature of the fraud does not further the accomplishment of the goal of the scheme because it notifies investors that their investments are in jeopardy. *See id.* Courts, however, view

"lulling" mailings or wires, that is letters to victims of a fraud intended to "lull" them into a false sense of security and thereby postpone inquiries, as furthering the fraudulent scheme. *United States v. Korab*, 893 F.2d 212, 215 (9th Cir. 1989). In the present case, a reasonable juror could have concluded that the communications were designed to reassure the investors and to put off having to explain what had happened to the funds they had invested. Therefore, the communications fall within the scope of conduct prohibited by 18 U.S.C. § 1343.

Defendant Shields also argues that by the time of Stafford's e-mails charged in Counts 16 and 17 that he and Stafford were no longer working together and that he, Shields, cannot be held responsible for any act by Stafford. Although there were problems between Shields and Stafford at the time of these e-mails, the facts viewed in the light most favorable to the prosecution support a conclusion that Shields had not withdrawn from their conspiracy.

**V. Motion for a Judgment of Acquittal on Counts 38, 39 and 40 (Docket No. 233)**

**A. Error in Count 40**

Defendant Shields moves for a judgment of acquittal on Counts 38, 39 and 40. He was found guilty only of Count 40. Therefore, the court addresses defendant's motion only as to that count. Count 40 charges securities fraud and aiding and abetting in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, and relates to an e-mail described as sent by Sam Stafford on June 9, 2008. Defendant Shields makes two arguments as to why he is not guilty of Count 40: (1) the wire described in Count 40 was identified as "Electronic mail from Stafford with the subject 'Stagecoach response to letter received today' regarding investment in Stagecoach Retail LLC" dated June 9, 2008 whereas, in actuality, the e-mail was authored by Shields and (2) there is no evidence that this e-mail was made in connection with the purchase or sale of any security which is an essential element of securities fraud. The wire was sent long after any money had been raised from the investor recipients of the wire or any securities had been sold or offered to the recipients.[1]

---

[1] Shields' motion is focused on whether or not this relationship with Stafford had been severed and, therefore, Shields could not be held responsible as of the time of the e-mails. Therefore, the court has not addressed the question of the scope of any conspiratorial relationship between Shields and Stafford.

The June 9, 2008 e-mail was also the subject of the wire fraud charged in Count 15. Count 15 originally erroneously identified the author of the e-mail as Stafford rather than Shields as did Count 40, but the error in Count 15 was corrected when the Government superseded the original Indictment. Stafford, however, was still identified in Count 40 as the author in the Superseding Indictment. The error was caught before the case was submitted to the jury and corrected in the verdict form. The Superseding Indictment was not given or read to the jury. There is no suggestion that the Government presented any e-mail dated June 9, 2008 to the grand jury or the trial jury other than the June 9, 2008 e-mail from Shields. The e-mail was correctly identified by date, description and author in Count 15 of the Superseding Indictment and correctly identified in Count 40 of the Superseding Indictment, except for its naming Stafford as the author. The verdict form correctly listed Shields as the author. The e-mail was also listed correctly in the Government's exhibit list. Thus, the only error was in identifying Stafford rather than Shields as the author of the e-mail in Count 40 of the Superseding Indictment.

Although material or substantial amendments to an indictment are not permitted without resubmission of the indictment to the grand jury, district courts may make amendments "concerning matters of form." *Russell v. United States*, 369 U.S. 749, 770 (1962); *see, e.g.*, *United States v. Neil*, 166 F.3d 943, 947–948 (9th Cir. 1999) (district court did not err in granting a motion to amend the indictment, during jury deliberations, where one bank robbery count referred to the wrong bank); *United States v. Lim*, 984 F.2d 331, 337 (9th Cir. 1993) (district court did not err in amending typographical error in statute citation). "An amendment of form and not of substance occurs when the defendant is not misled in any sense, is not subjected to any added burden, and is not otherwise prejudiced." *United States v. Kegler*, 724 F.2d 190, 194 (D.C. Cir. 1983) (*citing Williams v. United States*, 179 F.2d 656, 659 (5th Cir. 1950)).

The court finds that Shields was not misled by the listing of Stafford rather than Shields as the author of the e-mail in Count 40. The document in Count 40 was sufficiently identified so that Shields undoubtedly recognized the exhibit as authored by him in reviewing the discovery provided. It is also highly unlikely that the grand jury did not understand what it was charging in Count 40.

1  The court finds that the correction that was made was of a typographical error and to make the count
2  consistent with what the parties knew the charge was intended to address.

### B. The E-Mail Alleged in Count 40 Was in Connection with the Sale of Securities

Securities fraud can only occur if a deception is employed "in connection with the purchase or sale of [a] security." 15 U.S.C. § 78j(b) [also called Section 10(b) of the Securities Exchange Act]. Shields contends that the phrase "in connection with" does not include an alleged misrepresentation regarding the status of a security made over nine months after the purchase of that security, where no new offer to purchase or sell was made.

Shields is mistaken when he says an alleged misrepresentation made months after the investment cannot constitute securities fraud. As discussed with regard to the wire fraud allegations in Counts 15-17, post-investment misrepresentations designed to lull investors into a false sense that their investments are safe can constitute securities fraud. *Korab*, 893 F.2d at 215; *United States v. Jones,* 712 F.2d 1316, 1323 (9th Cir. 1983). In *Jones* defendants caused a bank to mail notices of lease payments to the investors which reassured the investors that all was well and discouraged them from investigating and uncovering the fraud. *Id.* "[T[hese notices lulled investors into feeling their investments were secure. Lulling mailings warrant jurisdiction over securities fraud." *Id.* In the instant case, the jury could have reasonably found that Shields' e-mail of June 9, 2008 was intended to lull the recipients into a false sense of security with respect to their Stagecoach investments.

### VI. Motion for Judgment of Acquittal on Counts 2, 3, 6, 8 and 36 (Docket No. 268)

#### A. Count 2 (Whitesides' Alafia Investment Made July 5, 2007)

Defendant Shields moves for judgment of acquittal on Count 2 which charges that the S3 Partners defrauded Phillip and Linda Whiteside who invested in the Alafia project on July 5, 2007 by wire transfer of $214,946.99. Shields argues that no evidence was introduced showing what, if any representations, were made to the Whitesides to persuade them to invest. Neither the Whitesides nor Allen Hu, the primary person with whom the Whitesides dealt at the time they

United States District Court
For the Northern District of California

invested,[2] testified. No evidence was presented that Shields even spoke to the Whitesides before they invested.

The Government counters that the Whitesides were investors in the Alafia project as established by the testimony of Marlene Hruby and Sam Kaanapu and that an inference can be drawn that the Whitesides were misled in the same way that the Government claims that the Hrubys and Kaanapus were.[3] The drawing of such an inference is questionable, however, given that the circumstances existing at the time of the Hrubys' and Kaanapus' investments in Alafia were different than they were at the time the Whitesides invested. It is not clear that the Whitesides, Hrubys and Kannapus all dealt with Hu, and, therefore all received the same information. More importantly, the Hrubys and Kannapus made their investments in October and November 2007, when Shields was under increasing financial stress as a result of the collapsing real estate market and the demands of the S3 projects.

The Government also refers to unspecified misrepresentations in an Alafia brochure and misrepresentations made at the March 2007 general presentation made by the S3 partners. However, there is no evidence that the Whitesides attended the March 2007 presentation, that any information specifically concerning Alafia was provided at the March 2007 presentation, or that the Whitesides saw any brochure containing the allegedly false representations. There is no evidence as to what was said to the Whitesides to get them to invest and by whom representations were made.

The Government, however, correctly asserts that it can be reasonably inferred that at the time the Whitesides invested that Shields did not intend to use the Whitesides' investment exclusively for the Alafia project. Although he did not personally solicit the funds from Whitesides, he knew that Sims and others working with Sims were soliciting funds for investment in particular projects. Despite this, the Whitesides' investment was first deposited in the Kingsmen Alf Group, Inc. account at the Bank of America and then the bulk of the funds were immediately withdrawn and placed with Golden Crest ($200,000) and Lewis Road Partners LLC ($12,000). Although the

---

[2] Allen Hu was associated with Golden Crest, which was Sims' business and became a part of S3.

[3] The papers filed by the Government do not specify the particular misrepresentations that were made to Hrubys and Kannapus which the Government claims that a jury could have inferred were also made to the Whitesides.

evidence does not establish what distribution of the funds was made from the Golden Crest account, $12,000 of the funds from the Kingsmen Alf account went to Lewis Road Partners LLC, an LLC apparently controlled by Shields and not related to the Alafia project. Exhibits 803 and 803A. The guilty finding on Count 2 against Shields is supported by the fact that Shields knew that funds were being sought for the Alafia project, and Shields intended to use the funds for other than the Alafia project for which they were being invested. Exhibit 805.

### B. Counts 3 and 36 (Nakamura's Stagecoach Investment Made July 13, 2007)

Defendant Shields moves for judgment of acquittal on Count 3, which charges that on July 13, 2007 he defrauded Mae Nakamura by inducing her to transfer $34,000 as an investment related to Stagecoach Village. Count 36 alleges securities fraud in connection with that same investment. Defendant Shields submits that the guilty verdict on these two counts is not supported by sufficient evidence. He points out that Nakamura did not testify and that the only documents introduced that Nakamura reviewed prior to her investment were a Stagecoach operating agreement (Exhibit # 1) and a Stagecoach property profile (Exhibit # 2). Shields argues that neither the operating agreement nor the property profile contains a false representation concerning Stagecoach, and, therefore there is a lack of evidence to support a claim that Nakamura was induced by fraud to invest in the Stagecoach project. Further, Shields did not speak to Nakamura before she invested.

The Government asserts that Exhibits 1 and 2 are similar to investment documents signed by Mark Shepard, Marlene Hruby and Eleonora Tomasello and, therefore, it is reasonable to infer that Nakamura was defrauded into investing in the Stagecoach project in the same way they were. However, the court does not find this argument persuasive. The Government does not cite in its Opposition to Shields' Motions for Acquittal the specific fraud to which it is referring that led to the Stagecoach investments of the Shepards, Hrubys or Tomasellos. The Government also claims that an e-mail dated June 9, 2008 from Shields to certain "concerned" Stagecoach investors supports the fraud alleged in Counts 3 and 36. However, that e-mail was sent approximately eleven months after Nakamura made her investment and thus provides no support for the guilty verdicts on Counts 3 and 36. The Government appears to take the position that the defendants' failure to live up to a promise to pay a certain return constitutes fraud. It is only fraud if the defendant did not intend to pay the

promised return at the time he made the promise.  On the other hand, an intent by one stealing funds to repay those funds in the future is not a defense.

Although the evidence of fraud is not extensive, the court does find merit to the contention that Nakamura and others were misled by express or implicit representations that the funds invested in Stagecoach would be used exclusively for the Stagecoach project and that Shields knew at the time of Nakamura's investment that he did not intend to use the funds exclusively for Stagecoach.[4] As shown in Exhibit 806, Nakamura's $34,000 investment was wired to S3 Partners LLC's bank account on July 13, 2007, commingled with funds invested by the Shepherds for the Sonterra project and the commingled funds were disbursed to various recipients three days later, including $475,000 to Hickory Acute Care, which was connected with Timothy Blanchat and the Oakmont property.  It is reasonable to infer that Shields intended to use Nakamura's, as well as Shepherd's, Sonterra investment without regard to the project for which they had been invested.  This is sufficient to support the verdict of fraud charged in Counts 3 and 36.

### D.  Count 6 (Hrubys' Stagecoach Investment Made August 31, 2007)

In Count 6 Shields is charged with wire fraud in connection with the wiring by Marlene and Ronald Hruby on August 31, 2007 of $120,125.88 as an investment in the S3 Stagecoach project. Although Marlene Hruby testified, she did not identify any false promises made to her with respect to the Stagecoach investment.  The Government's response to the motion for acquittal on Count 6 cites to little evidence supporting the guilty verdict.  First, the Government says that the evidence supporting Shields' fraud in connection with an investment made by the Hrubys in the Alafia project approximately one month later suggests that Shields committed fraud with respect to the Stagecoach investment.  This logic is difficult to accept, since the Alafia investment was made after the Stagecoach investment when economic pressures were greater and continuing to increase.

Second, the Government argues that Exhibit 30 (Stagecoach operating agreement) and 32 (wiring instructions for the Hrubys' Stagecoach investment) are substantially similar to documents provided to other individuals who the Government says were defrauded into investing in the

---

[4] Since Sims was acquitted on Counts 3 and 36, it appears that the jury did not find that Sims made a knowing misrepresentation to Nakamura in July 2007 when he communicated with her about investing in Stagecoach.

Order on Motions for Acquittal or New Trial
CR-12-00410                                                  10

Stagecoach project. Therefore, according to the Government, it is logical to infer that the Hrubys were defrauded into investing in Stagecoach. The court does not find this argument persuasive. The Government has failed to cite to any fraudulent scheme or promise that induced Hrubys to wire their investment.

The Government then cites to evidence that Shields engaged in bank fraud with respect to the Stagecoach bank loans. However, the first charged bank fraud count dealing with Stagecoach did not occur until February 5, 2008, months after the Hrubys were allegedly induced to invest in Stagecoach. This evidence does not suggest that the Hrubys were induced by fraud to invest.

The Government argues that a June 9, 2008 response to a letter from concerned Stagecoach investors and the testimony of construction witness Bruce Wyman show that Shields lied to Stagecoach investors as to the status of the project. This evidence does not clearly support the Government's contention that the Hrubys' were induced by fraud to invest. Although Ms. Hruby testified that Sims did say that they had tenants already lined up, she did not say that Sims represented how many tenants had been lined up or whether "lined up" meant that leases had actually been signed. She acknowledged that she understood that Stagecoach was a high end retail shopping center that was being developed and that Stagecoach would own the structure and lease units to tenants.

Ms. Hruby described that prior to their investment in Stagecoach, they were given "a big notebook with all kinds of information in it and dividers and everything . . . . related to Stagecoach." Hruby Trial Testimony. Although she stated that she had the notebook at home, neither the whole notebook nor anything from it was presented at trial which suggests that it did not contain any false statements that induced the Hrubys to invest in the Stagecoach project.

The only persuasive argument that the Hrubys were induced by fraud to invest is the fraud that pervades the entire case, that is, that funds were being sought for specific projects when Shields knew that he intended to use the funds for other than the chosen investment as he saw fit. Count 6 is supported on that basis.

**E. Count 8 (Kaanapu's Investment in Alafia Made November 21, 2007)**

Count 8 of the Superseding Indictment alleges wire fraud in connection with a $239,494.38 transfer of funds by Sam and Juana Kaanapu on November 21, 2007 as an investment in Alafia. Defendant Shields contends that the Government failed to prove that he committed fraud in connection with this investment. Shields points out that Mr. Kaanapu testified that this money was wired in connection with property that he was told was "going to be" an assisted living facility – not that it already was. He did not testify regarding any knowledge of a preexisting facility at all at the time of the wire transfer. He testified that he saw site plans only after the wire transfer. Mr. Kaanapu knew not only that there was to be a mortgage taken out on the property, but that there already was such a mortgage, as he signed a mortgage assumption agreement.

The Government contends that the Kaanapus were defrauded because the S3 Partners did not own or control the property at 3198 South Kingsmen Avenue, Brandon, Florida and the S3 Partners had been told by Mr. Fusia, the owner of the property, that he was not going to sell to Shields and his partners. The property profile information for Alafia that was given to investors came from Shields. Shields did not tell the investors (and apparently Sims) that there were major obstacles with respect to the Alafia project both as to acquiring the land and getting governmental approvals for the contemplated development. This failure, along with his intent to use investments for whatever purpose he wanted or needed them for support the fraud finding on Count 8. The $239,494.38 investment made by the Kaanapus was immediately used to pay the Blanchats in connection with the Oakmont project.

### F. Counts Defendant Claim Require Unanimity Instructions

#### 1. Count 1––Conspiracy

Defendant Shields submits that the court's unanimity instructions on Counts 1-4, 6-11 and 13-17 were inadequate and require reversal. Count 1 charged that Shields, Stafford and Sims conspired to commit wire fraud, mail fraud and bank fraud and alleges numerous ways in which they did so. Shields was found guilty of the conspiracy count.[5] The court instructed the jury, among other things, that: "You must find that there was a plan to commit at least one of the crimes alleged as an object of the conspiracy, specifically a plan to commit wire, mail, or bank fraud. You must all

---

[5] Stafford pleaded guilty to the charge and Sims was acquitted of it.

agree as to the particular crime which the conspirators agreed to commit." Jury Instruction No. 16 (Docket # 261). The court also instructed the jury on the elements of wire, mail and bank fraud for each of individual counts alleging fraud.

Shields argues that the jury should have been instructed: "You may not convict unless you find beyond a reasonable doubt that there was a plan to commit at least one act of wire fraud, mail fraud, or bank fraud. Further, you may not convict a defendant of conspiracy unless all of you agree as to the particular wire fraud crime, the particular mail fraud crime, or the particular bank fraud crime which the conspirators agreed to commit." Shields' Proposed Instruction No. 16 (Docket # 225). Shields also asserts that a special verdict form should have been used which required the jury, if they found Shields guilty of Count 1, to state whether they unanimously "agree as to the particular crime that the conspirators agreed to commit; and whether they "unanimously agree as to the particular criminal objective that Mr. Shields knew about and intended to help commit." Shields' Proposed Form of Verdict (Docket # 226).

The jury was instructed on the requirement that they unanimously find that there was a plan to commit at least one of the crimes charged as an object of the conspiracy and that they all agree on the particular crime which the conspirators agreed to commit. This instruction was adequate. A general unanimity instruction is sufficient in most cases, *United States v. Kim*, 19 F.3d 1079, 1082 (9th Cir. 1999), and here the instruction was more than a general unanimity instruction as it advised the jury that they had to agree on the plan and the particular crime which the conspirators agreed to commit. Even if there was some inadequacy in the court's conspiracy instruction, the jury was instructed on the individual elements of each wire fraud count and the jury found Shields guilty on several of those counts, leaving no doubt that he committed at least some of the objects of the alleged conspiracy. Therefore, any error in the instructions was harmless.

### 2. Counts 2-4, 6-11 and 13-17–-Wire Fraud

Shields contends that the wire fraud instructions were deficient because the court was

required to instruct that the jury must unanimously agree on the scheme that defendant committed and also on at least one specific alleged false statement that was made. The court only instructed on the latter.

Defendant Shields' contention is without merit. Under the wire fraud statute the Government is not required to prove that any particular false statement was made. The Government has alternative ways of proving wire fraud. It can only establish either a scheme to defraud, which may or may not involve any specific false statements, or a false statement. *United States v. Woods*, 196 F3d 1079, 1099 (9th Cir. 1999). The jurors are not constitutionally required to unanimously agree on alternative theories of criminal liability. *Kim*, 19 F.3d at 1082. The instructions given by the court adequately protected defendant. Therefore, the court denies defendant Shields' motion for acquittal on Counts 1-4, 6-11 and 13-17 based upon the claim that the court erred in not more fully instructing on the unanimity requirements. In addition, a new trial is not required by the interests of justice. *See* Fed. R. Crim. P. 33.

**VI. Order**

The court denies defendant Shields' motion for judgment of acquittal and his alternative motion for a new trial.

DATED:     September 23, 2014

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge