E-FILED on  October 9, 2014

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| UNITED STATES, | LOSS CALCULATION UNDER USSG §2B1.1(a) and (b)(1) |
|---|---|
| Plaintiff, | |
| v. | |
| MELVIN RUSSELL "RUSTY" SHIELDS, MICHAEL SIMS and SAM STAFFORD, | |
| Defendants. | |

The issue of what are the loss amounts attributable to defendants Melvin Russell "Rusty" Shields and Michael Sims under USSG §2B1.1(a) and (b)(1) was heard by the court on September 23, 2014. Final sentencing will take place on November 17, 2014. The Government offered three binders of documents, some of which had been introduced at trial and some of which the Government introduced for consideration at the September 23, 2014 hearing to show relevant conduct that it claims supports significantly higher loss figures than the amounts which are attributable to the counts of conviction. Neither defendant offered additional evidence.

The Government has the burden of supporting the loss amount by a preponderance of the evidence, unless the enhancement in the offense level as a result of the loss amount has an extremely disproportionate effect in which case findings of fact supporting the loss must be proved by clear and convincing evidence. *United States. v. Lyons*, 472 F.3d 1055, 1070-71 (9th Cir. 2007). Although "the

1  full scope of the defendant's fraudulent conduct is taken into account when calculating the intended loss"
2  (*United States v. Tulaner*, 576 F.3d 576, 578 (9th Cir. 2008)," the court need only make a reasonable
3  estimation of the loss." USSG §2B1.1, Application Note 3(C).  Money returned to a victim before the
4  offense was detected is a credit against loss.  USSG § 2B1.1, Application Note 3(E)(i).  In a case of fraud
5  involving a mortgage loan, the fair market value of the collateral as of on the date of conviction is also
6  credited against the loss.  USSG §2B1.1, Application Note 3(E)(iii).

7  With these principles in mind, the court determines the loss figures for Sims and Shields.

## Loss Amount Attributed to Michael Sims

9  Sims was convicted of two counts of wire fraud in connection with investments by Sam
10 Kaanapu and Juana Kaanapus of $239,494.38 in the Alafia Village project and $178,000 in the
11 Stagecoach project.  Sims argues that these are the only losses that can be attributed to him and that
12 the Government erroneously seeks to hold him responsible for losses on counts on which he was
13 acquitted. Sims describes the Government's loss calculation except for the amounts attributable to
14 the Kaanapus' investments as "pure fantasy unsupported by law or reason." Sims' Position
15 Statement Re Loss, p. 1.

16 In contrast to Sims' position, the Government submits that it showed "numerous ways in
17 which Sims' criminal conduct contributed to substantial losses that the S3 victim-investors suffered"
18 including Sims' making false representations as the primary recruiter of investors, withholding
19 information about the status of S3 projects and diverting investor funds. United States' Filing
20 Regarding Loss Amount, pp. 7-8.

21 The Government and Sims appear to agree on the amount of the loss related to Sims'
22 conviction on Count 8 of wire fraud involving the Kaanapus $239,494.38 investment in the S3
23 Alafia Village Project. The Kaanapus received $6,033.46 from S3 in connection with this investment
24 resulting in a net loss amount attributable to Sims from Count 8 of $233,460.92.

25 The jury also found Sims guilty of Count 12 which alleges wire fraud involving the interstate
26 wire "Transfer of $178,000 of Sam Kaanapu and Juana Kaanapu's funds" related to their S3
27 Stagecoach Project investment.  The Kaanapus received no return on this investment and thus
28

United States District Court
For the Northern District of California

1  suffered a loss  their investment. Therefore, the total loss amount that the Kaanapus suffered related
2  to Sims' two counts of conviction is $411,460.92.

3       The court is not limited to offense conduct in the context of sentencing and may consider all
4  of the defendant's "relevant conduct" in calculating loss under §2B1.1. U.S.S.G. §1B1.3. Relevant
5  conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded,
6  induced, procured, or willfully caused by the defendant ... that occurred during the commission of
7  the offense of conviction," U.S.S.G. § 1B1.3(a)(1)(A), and "all harm that resulted from [such] acts
8  and omissions." U.S.S.G. § 1B1.3(a)(3). The court can even consider conduct for which the
9  defendant has been acquitted. *United States v. May*, 706 F.3d 1209, 1212-1213 (9th Cir. 2013).
10 However, here, the initial critical question is whether the evidence showed by at least a
11 preponderance that Sims committed the acts or omissions that the Government alleges constitute
12 relevant conduct.

13      One of the elements of both mail and wire fraud is the intent to deceive or cheat.  The court
14 is not satisfied that the Government satisfied that burden.  Although Sims was heavily involved in
15 recruiting investors, it is not clear that he knowingly gave out false or misleading information or
16 intended to deceive or cheat anyone other than the Kaanapus.  It appears that to some extent Sims
17 relied on Shields and Stafford and was a victim himself.  Therefore, the court finds that the amount
18 of loss attributable to Sims is limited to the **$411,460.92** attributable to his counts of conviction.  **His**
19 **Base Offense Level is 7 under §2B1.1(a) with a 14 level increase pursuant to §2B1.1(b)(1)(H).**
20 Other adjustments to the Base Offense Level, if any, will be subject of the hearing on November 17,
21 2014.

22      **Loss Amount Attributable to Elvin Russell "Rusty" Shields**

23      Shields was convicted of thirty-two counts charges of conspiracy to commit wire and bank
24 fraud, wire fraud, bank fraud, making a false statement to a bank and securities fraud.  The
25 Government describes the evidence of Shields' fraud as "overwhelming" and calculates the loss
26 attributable to it at over 7 million dollars. *See* United States' Opp. to Shields' Mot. for Acquittal
27 (Dckt. #271 at 9); United States' Filing Regarding Loss Amount (Dckt. # 296 at 4).  The
28 Government points to, among other evidence, that Shields had primary control over S3's accounts

and diverted millions of investor and bank funds for unauthorized purposes. He also committed fraud in connection with the execution of documents and draw requests and invoices to Century Bank in Sarasota Florida and First Savings Bank in Las Vegas.

Shields contends that the evidence reflected "more of an autopsy of the financial markets, real estate markets and banking failures, failures which commenced as financial optimism was still high, but the system was broken." Memo. re Hearing for Determination of Sentencing Guideline Loss Figure at 1 (Dckt. #300). He asserts that the loss amount is between $847,261.00 and $1,424,443.98.[1]

Whether any of the S3 projects would have been successful had the real estate market not collapsed is a matter of speculation. The projects were real; they were not fictitious projects created by Shields to obtain funds for his personal use. However, Shields committed various fraudulent acts and omissions in his attempt to make his grandiose plans successful. The issue currently before the court is what is the loss amount attributable to Shields. That question turns on what is relevant conduct for which Shields is responsible.

**A. Losses Resulting From Transfers Identified in Counts of Conviction**

**1. Loss Amounts Suffered by Investors**

The parties essentially agree on the amount of the lost investments attributable to the counts of conviction. Shields calculates that figure to be $1,365,514.38 while the Government finds the total to be **$1,364,027.30** which the court adopts.

**2. Bank Fraud**

**a. Century Bank - Sarasota Florida**

Shields was convicted of bank fraud with respect to the submission of fraudulent invoices in November 2007 to the Century Bank in Sarasota, Florida and with respect to forged closing documents related to the purchase of the property. The Government submits that the loss amount with certain credits given to Shields is $1,008,115.66 calculated as follows: $2,396,073.85 (loan amount)+ $529,115.66 (bank maintenance costs) - $1,525,000 (appraised value of foreclosed

---

[1] At the time of Shields submitted his loss calculation, the court still had Shields' motion for acquittal and new trial as to certain counts under submission.

Loss Calculation Under USSG §2B1.1(a) and (b)(1)
CR-12-00410 RMW                    -4-

1  property) - $396,000 (interest payments) = **$1,004,189.51**.  Shields contends the value of the land
2  and interest payments exceed what was owed to the Bank and, therefore, there is no loss.  The court
3  finds that the Government's calculation is a fair estimate of the loss resulting from Counts 22 and
4  23.  Although the appraisal may be low, the Government has given credit for interest payments
5  which actually did not lower the principal due.

### 2. First Savings Bank - Las Vegas

After the hearing on September 23, 2007 the Government submitted a letter from counsel advising as to how the loss from Counts 13, 14, 24, 25, 26, and 27 involving fraud on First Savings Bank - Las Vegas should be calculated based upon information an FBI agent obtained after the hearing from a First Savings Bank representative.  The court will not consider that information in its calculation because it was submitted late and defendants obviously did not have an opportunity to review it.  The court does not find any loss amount sufficiently supported and thus will not include any in the loss calculation.  The court may, however, consider any loss by First Savings in determining restitution if a loss can be further supported.

### B. Consideration of Relevant Conduct in Determining Amount of Loss

#### 1. Additional Losses Suffered by Investors in Stagecoach During the Same Time Period But Not the Subject of Counts in the Superseding Indictment

The evidence presented by the Government for consideration in sentencing combined with the evidence admitted at trial shows that investments were made and lost by investors in Stagecoach in addition to, and during the same time period as, the investments that were the subject of specific counts. These transfers were made as part of the same course of conduct as the offenses of conviction and, therefore, constitute relevant conduct.  U.S.S.G. § 1B1.3(a)(2); *see United States v. Horob*, F.3d 866, 872  (9th Cir. 2013).  The transfers are:

| Investor | Date of Transfer | Amount of Loss |
|---|---|---|
| Shepards | October 11, 2007 | $132,570 |
| Nakamura | July 6, 2007 | $ 84,000 |
| Harold Wilson | July 27, 2007 | $227,892 |
| **TOTAL** |  | **$444,462** |

#### 2. Additional Losses Suffered by Early Investors in Stagecoach

Loss Calculation Under USSG §2B1.1(a) and (b)(1)
CR-12-00410 RMW                          -5-

United States District Court
For the Northern District of California

The Government also contends that losses by investors who invested in the early phase of the Stagecoach Project (January - March 2007) are the result of Shields' same course of conduct as the offenses of conviction and constitute relevant conduct. Although the Government overstates the extent of Shields' fraud, the evidence is sufficient to show that Shields diverted funds solicited for the Stagecoach project and used them other than for the Stagecoach project. This diversion contributed to the loss of the investors' funds which were to be invested for the Stagecoach project. Nothing was realized on the Stagecoach investments and no portion of them was returned. The lost investments are identified by investor, date of investment and amount:

| John Coyle | March 5, 2007 | $250,000 |
| Masao Koketsu | February 2, 2007 | $250,000 |
| Loren Mendel | March 2, 2007 | $250,000 |
| Jana Martincikova | January 31, 2007 | $238,000 |
| Brenda Phillips | February 1, 2007 | $200,000 |
| Sharon Oliver | January 26, 2007 | $170,000 |
| **TOTAL** | | **$1,358,000** |

### 3. Losses Suffered by Investors in the Oakmont Project Which Are Not the Subject of Counts in the Superseding Indictment

The Government contends that Shields contributed to the loss of the investors' funds which were invested for the Oakmont project. The evidence established that funds that the investors invested for the Oakmont project were diverted and not necessarily used in that project. Shields also knowingly failed to disclose material information to the investors prior to their investments about the means by which the S3 Partners intended to finance the purchase of the Oakmont property. The losses to Oakmont investors are:

| Investor | Date of Investment | Amount of Investment | Return on Investment | Net Loss |
|---|---|---|---|---|
| Xianjin O'Malley | November 28, 2006 | $230,000 | $27,305.37 | $202,694.63 |
| Karen Peck | January 17, 2007 | $100,000 | $10,502.08 | $89,497.92 |
| John Heather | December 8, 2006 | $450,000 | $52,190.76 | $397,809.24 |

Loss Calculation Under USSG §2B1.1(a) and (b)(1)
CR-12-00410 RMW                    -6-

| Donna and Ken Shim | December 6, 2006 | $320,000 | $37,113.44 | $282,886.56 |
| --- | --- | --- | --- | --- |
| Ken Shim | December 24, 2006 | $100,000 | $11,433.59 | $88,566.41 |
| Gil Decker | December 4, 2006 | $250,000 | $29,131.85 | $220,868.15 |
| May Hu | December 8, 2006 | $180,000 | $20,876.31 | $159,123.69 |
| Dennis Steffani | January 3, 2007 | $150,000 | $16,287.32 | $133,712.68 |
| M. Khodorkovsky | December 21, 2006 | $150,000 | $16,862.66 | $133,137.34 |
| Total Net Loss | | | | **$1,708,296.32** |

### 4. Losses Suffered by Investors in the Sonterra Project Which Are Not the Subject of Counts in the Superseding Indictment

The Government contends that Shields contributed to the loss of the investors' funds which were invested for the Sonterra project in addition to the losses attributable to the counts of conviction. Like the situation with other S3 projects, the evidence established that funds that the investors invested for the Sonterra project were diverted and not necessarily used in that project. The investors realized nothing on their investments and their losses are:

| **Investor** | **Date of Investment** | **Loss Amount** |
| --- | --- | --- |
| George Doub | April 12, 2007 | $350,000 |
| Laura Hill | September 21, 2007 | $ 75,000 |
| Karen Smith | August 16, 2007 | $ 50,000 |
| **TOTAL** | | **$475,000** |

### 4. Other S3Project Investments

The court does not find the evidence sufficient to attribute other alleged losses form S3 investments (e.g. Morengo Ranch, Centra PalmCourt) to the loss calculation**.**

### C. Total Loss Attributable to Shields

The amount of loss attributable to Shields is **$6,353,975.13.  His Base Offense Level is 7 under §2B1.1(a) with an 18 level increase pursuant to §2B1.1(b)(1)(J).**


RONALD M. WHYTE
United States District Judge