1
2
3      **UNITED STATES DISTRICT COURT**
4      **NORTHERN DISTRICT OF CALIFORNIA**
5      **SAN JOSE DIVISION**
6

7      UNITED STATES OF AMERICA,

       Plaintiff,

8
9           v.

10     MELVIN RUSSELL "RUSTY" SHIELDS,

       Defendant.

11
12
13
14
15

Case No.  12-cr-00410-BLF-1
Case No.  17-cv-03978-BLF

**ORDER DENYING DEFENDANT'S
MOTION UNDER 28 U.S.C. § 2255 TO
VACATE, SET ASIDE, OR CORRECT
SENTENCE; DENYING
DEFENDANTS' MOTION FOR AN
EVIDENTIARY HEARING;
GRANTING DEFENDANT'S MOTION
TO SUPPLEMENT THE RECORD;
AND DIRECTING GOVERNMENT TO
FILE SUPPLEMENTAL EXCERPTS
OF RECORD**

[Re:  ECF 462, 525]

16          After a seven-week trial, a federal jury found Defendant Melvin Russell "Rusty" Shields

17     guilty of 32 counts, including conspiracy, wire fraud, bank fraud, securities fraud, and making

18     false statements to a bank.  The Ninth Circuit Court of Appeals affirmed Shields' conviction on

19     direct appeal in both a published opinion, *United States v. Shields*, 844 F.3d 819 (9th Cir. 2016)

20     ("*Shields I*"), and an unpublished memorandum, *United States v. Shields*, 673 F. App'x 625 (9th

21     Cir. 2016) ("*Shields II*").

22          Shields seeks relief from his conviction and sentence under 28 U.S.C. § 2255, asserting

23     claims for:  (1) actual and factual innocence; (2) ineffective assistance of trial counsel based on

24     failure to retain experts in real estate, banking, and finance; (3) *Brady* and *Napue* violations; (4)

25     ineffective assistance of trial counsel on multiple grounds; and (5) due process violations.  *See* §

26     2255 Motion, ECF 462.  He has filed a Motion for an Evidentiary Hearing and a Motion to

27     Supplement the Record.  *See* Motion for Evid. Hrg., Exh. A to Reply, ECF 523-1; Motion to

28     Supplement the Record, ECF 525.

For the reasons discussed below, Shields' § 2255 Motion and Motion for an Evidentiary Hearing are DENIED.  His motion to supplement the record is GRANTED.

## I.     BACKGROUND

*Indictment*

On May 23, 2012, a grand jury issued a 33-count Indictment charging Shields and his two business partners, Michael Sims and Sam Stafford, with conspiracy to commit wire, mail, and bank fraud in violation of 18 U.S.C. § 1349; wire fraud in violation of 18 U.S.C. §§ 1343 and 2; mail fraud in violation of 18 U.S.C. §§ 1341 and 2; bank fraud in violation of 18 U.S.C. § 1344; and securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5, and 18 U.S.C. § 2.  Indictment, ECF 1.

The Indictment alleged the following facts:  Shields, Sims, and Stafford formed a limited liability real estate company called S3 Partners LLC.  Indictment ¶ 1, ECF 1.  Beginning in 2006, Shields, Sims, and Stafford ("S3 Partners") solicited investments from individuals and banks.  Indictment ¶ 2.  Shields had primary financial control over the S3 bank accounts and directed the flow of investor money.  *Id.*  Sims did most of the fundraising.  Indictment ¶ 5.  Stafford handled real estate development.  Indictment ¶ 6.

From 2007 to 2009, the S3 Partners obtained millions of dollars from investors, allegedly to fund numerous real estate projects including the Stagecoach Retail Project and the Alafia Village Project.  Indictment ¶¶ 10-24.  Investors in a particular project were told that their money would go only to that project.  *Id.*  In reality, funds obtained from investors and bank loans for particular projects were diverted to other purposes.  *Id.*

The S3 Partners obtained millions of dollars in investments for the Stagecoach Retail Project, which was to have been development of retail store tenant units located within the Stagecoach Village shopping center near Phoenix, Arizona.  Indictment ¶¶ 10-11.  The S3 Partners also obtained a loan in excess of $4 million from First Savings Bank.  *Id.* ¶ 12.  As alleged in the Indictment, the S3 Partners used only a portion of those investment and loan funds for the Stagecoach Retail Project, and they diverted the remaining funds to other S3 real estate development projects, their own personal use, and other unauthorized uses.  *Id.* ¶ 13.  The S3

Partners did not complete the retail tenant units as promised, and ultimately the First Savings Bank was forced to foreclose. *Id.* The failure of the Stagecoach Retail Project cost individual investors and First Savings Bank more than $4 million in losses. *Id.*

The S3 Partners also obtained millions of dollars in investor funds for the Alafia Village Project, which was to have been a development serving the elderly community near Tampa, Florida. *Id.* ¶¶ 17-18. The S3 Partners allegedly used only a portion of those funds for the Alafia Village Project, and they diverted the remaining funds to their own personal use, personal business ventures, and other unauthorized uses. *Id.* ¶ 19. The Alafia Village Project failed, resulting in a near-total loss to investors. *Id.*

### *Shields' Waiver of Personal Appearance*

On February 4, 2013, Shields filed an application for a waiver of his personal appearance. Applic. for Waiver of Personal Appearance, ECF 60. The application stated: "Defendant hereby waives the right to be present in person in open court upon the hearing of any motion or other proceeding in the above-captioned case, including, but not limited to, when the case is set for trial, when a continuance is ordered, and when any other action is taken by the court before or after trial, except upon arraignment, plea, any proceeding on a motion that will involve an evidentiary hearing, impanelment of jury, trial, and imposition of sentence." *Id.* at 1. Senior District Judge Ronald M. Whyte, to whom the case was assigned, granted the application on February 8, 2013. Order Granting Applic. for Waiver of Personal Appearance, ECF 61.

### *Superseding Indictment*

On September 18, 2013, a 40-count Superseding Indictment issued, adding counts of making a false statement to a bank in violation of 18 U.S.C. §§ 1014 and 2 against Shields, Sims, and Stafford. *See* Superseding Indictment, ECF 122.

### *Trial*

Judge Whyte presided over a seven-week jury trial on the charges against Shields and Sims, commencing on November 5, 2013. *See* Minutes, ECF 175. Stafford pled guilty to conspiracy to commit wire fraud, mail fraud, and bank fraud, and testified for the Government at the trial. *See* Minutes, ECF 155; Stafford Testimony, Government's Supplemental Excerpts of

1    Record ("GER") 2156-2393.[1]  The Government's theory was that the S3 Partners – Shields, Sims,

2    and Stafford – conspired to and did defraud banks and investors of millions of dollars by soliciting

3    loans and investments for particular real estate development projects and then diverting those

4    funds to other projects or their own personal use.  *See* Gov't Opening Statement, GER 163-190.

5    The Government sought to prove that the S3 Partners submitted forged and fraudulent invoices to

6    banks, representing that work had been done on projects when it had not, in order to elicit loan

7    funds.  *See id.*  The Government also sought to prove that the S3 Partners targeted elderly

8    investors and convinced them to part with retirement savings and children's education funds by

9    lying about the safety and stability of the S3 projects, with result that most investors lost

10   everything.  *See id.*  The Government called thirty-eight witnesses, including victims who testified

11   about their dealings with S3 Partners and their losses; Kathryn Comer, the bookkeeper for S3

12   Partners, who testified about money flow; Stafford, who pled guilty to conspiracy with Shields

13   and Sims and testified about the S3 Partners' dealings; and Thomas Carocci, an attorney with the

14   Financial Industry Regulatory Association ("FINRA"), a private organization funded by the

15   securities industry that investigates and regulates white collar crime.

16        Shields was represented at trial by two attorneys, Thomas Nolan and Shira Kieval.  *See*

17   Notice of Additional Counsel, ECF 176.  Mr. Nolan was appointed to represent Shields pursuant

18   to the Criminal Justice Act, and Ms. Kieval was authorized to assist in the representation.  *See id.*

19   The defense theory was that Shields was a well-intentioned "ideas guy" who went into business

20   with two men he didn't know well (Sims and Stafford), got in over his head, and lost everything

21   when the market took a downturn.  *See* Shields Opening Statement, GER 191-204.  Shields'

22   counsel relied on cross-examination of the Government's witnesses, and called three witnesses for

23   the defense, including James Hayden, who ran a commercial real estate brokerage firm hired by

24

25   _____

26   [1] In opposing Shields' § 2255 motion, the Government has cited to the Government's
     Supplemental Excerpts of Record (Volumes 1-14) filed in the Ninth Circuit Court of Appeals in
     connection with Shield's direct appeal.  Shields cites to the excerpts in his Reply.  While a
27   courtesy copy has been provided to chambers, it does not appear that the excerpts of record have
     been filed on the docket in this case.  The Government is directed to file the Government's
28   Supplemental Excerpts of Record (Volumes 1-14) in this case so that the record contains all
     materials cited in the parties' briefing.

S3 Partners to list and lease the units in the Stagecoach Retail Project once completed; Michael Wickersham, a real estate appraiser; and Joseph Joseph, who was engaged by S3 Partners to evaluate the purchase of a senior facility for the Alafia Village Project. Shields did not testify.

Sims did testify, and he also called three other witnesses.

The jury convicted Shields on 32 counts in the Superseding Indictment, including conspiracy to commit wire and bank fraud, 14 counts of wire fraud, 7 counts of bank fraud, 7 counts of making a false statement to a bank, and 3 counts of securities fraud. Minutes, ECF 265; Verdict Form, ECF 266. The jury acquitted Shields on the remaining counts in the Superseding Indictment. *Id*. Sims was convicted of 2 counts of wire fraud and acquitted on the remaining counts in the Superseding Indictment. Minutes, ECF 265; Verdict Form, ECF 267.

*Loss Hearing*

On September 23, 2014, Judge Whyte held a post-trial hearing to determine the loss attributable to each defendant for purposes of determining the offense level under United States Sentencing Guideline ("U.S.S.G.") 2B1.1 (2014). Minutes, ECF 319. Under U.S.S.G. 2B1.1, offense level for certain economic offenses is determined by increasing the base level anywhere from 2 levels to 30 levels depending on the loss amount. The Minutes from the hearing noted that "Defendant Shields [sic] appearance was previously waived." Minutes, ECF 319.

After the hearing, Judge Whyte issued a written order determining that the amount of loss attributable to Shields was $6,353,975.13, and the amount of loss attributable to Sims was $411,460.92. *See* Order on Loss Calculation, ECF 320. Judge Whyte's loss determination with respect to Shields resulted in an 18-level increase of the base offense level of 7. *See id.* at 7; *see also* U.S.S.G. 2B1.1(b)(1)(j) (2014) (providing for an 18-level increase for a loss that is between $2,5000,000 and $7,000,000).

*Sentencing and Judgment*

Judge Whyte held a sentencing hearing on November 17, 2014, at which the Court heard from seventeen victims as well as the parties. *See* Minutes, ECF 340, 341. Judge Whyte ultimately entered judgment against both Shields and Sims on December 15, 2014. *See* Judgments, ECF 350, 351. Shields was sentenced to a 78-month term of imprisonment, a 5-year

term of supervised release, a special assessment of $3,300, and restitution in the amount of $7,222,905.03. Judgment re Shields, ECF 350. Sims was sentenced to a 30-month term of imprisonment, a 3-year term of supervised release, a special assessment of $400, and restitution in the amount of $ 411,460.92. Judgment re Sims, ECF 351.

*Appeal*

Shields appealed, and as noted above, the Ninth Circuit Court of Appeals affirmed his conviction in both a published opinion and an unpublished memorandum. *See Shields I*, 844 F.3d 819; *Shields II*, 673 F. App'x 625. Shields was represented on direct appeal by attorney Erick Guzman.

*Present § 2255 Motion*

Shields filed the present § 2255 Motion on July 14, 2017. *See* § 2255 Motion, ECF 462. Briefing was delayed so that the Government could pursue discovery regarding Shields' claims of ineffective assistance of counsel ("IAC") with respect to his trial counsel, Thomas Nolan. Shields does not assert IAC claims against Mr. Nolan's co-counsel, Shira Kieval. Mr. Nolan was interviewed by the Federal Bureau of Investigations ("FBI") on March 8, 2018, in the presence of two Assistant United States Attorneys, and the interview was documented in a Form FD–302 ("Nolan 302").[2] The Government filed its Opposition to the § 2255 Motion on May 30, 2018, attaching the Nolan 302 as Exhibit C. *See* Opp., ECF 497; Nolan 302, Exh. C to Opp., ECF 497-3. Shields filed a Reply October 5, 2018. *See* Reply, ECF 523.

In addition to the § 2255 Motion, Shields filed more than a dozen motions seeking various types of relief, including immediate release, a reduction in sentence, compassionate release, release on bail, an extension of time for briefing, to strike the Government's filings, a new trial, to vacate his conviction, an evidentiary hearing, and reconsideration of prior rulings. *See* ECF 463, 472, 486, 491, 499, 502, 507, 510, 511, 512, 525, 526, 531, 541. The Court has addressed all but

---

[2] "After FBI agents conduct a formal interview, they incorporate their handwritten notes into a more complete report of the interview on the FBI's Interview Report Form FD–302, known colloquially as a '302.'" *United States v. Lloyd*, 807 F.3d 1128, 1159 (9th Cir. 2015) (internal quotation marks, citation, and alterations omitted).

one of those motions – a Motion to Supplement the Record of the Continued, Documented Government Interference (ECF 525), discussed below – in written orders issued between July 2017 and June 2019. *See* ECF 467, 474, 485, 487, 495, 500, 509, 519, 534, 536, 540, 543.

Shields' filings asserted new constitutional claims not encompassed by his § 2255 Motion. The Court therefore found it necessary to clarify the scope of the § 2255 Motion. The Court issued an order clarifying that the motion is limited to five claims, as set forth in the documents filed at ECF 462, 465, and 486: (1) actual and factual innocence; (2) ineffective assistance of trial counsel for failure to call or consult with certain experts; (3) *Brady* and *Napue* violations; (4) ineffective assistance of trial counsel based on conflict of interest; and (5) due process violation. Order Clarifying Scope at 10, ECF 519.

The Court noted that Shields had submitted documents referring to fourteen new claims that were not grounded in facts encompassed by his § 2255 Motion. Order Clarifying Scope at 6. The Court offered Shields an opportunity to seek leave to amend his § 2255 Motion in lieu of filing a reply brief. Order Clarifying Scope at 7. Shields did not file a motion for leave to amend, and instead he filed a document titled "Petitioner's Final Reply (Traverse) to the Government's Answer to Petitioner's 2255 Motion." Reply, ECF 523.

*Motion to Supplement the Record*

After filing his Reply, Shields filed a "Motion to Supplement the Record of the Continued, Documented Government Interference" ("Motion to Supplement the Record"). *See* Motion to Supplement the Record, ECF 525. He states that the purpose of the motion is to document misconduct by prison staff, including: opening, reading, and copying his legal mail; destroying and tampering with Shields' "Special Mail" to a United States Senator and a Congressman; refusing to allow privileged telephone calls between Shields and his appellate counsel during the pendency of his direct appeal; transferring Shields to different institutions three times; denying access to legal materials; and denying Shields' request to make telephone calls to the Court. *See id.* at 1-2. A set of emails between Shields and the administrator of his prison institution is attached to the motion. *See id.* Shields asks that the Court "consider these latest verifiable examples of the government's continued interference when evaluating Petitioner's claims against

7

1    the government, not only during the entire length of his Direct Appeal but also during his 2255

2    Motion and through today." *Id.* at 3.

3            The Motion to Supplement the Record is GRANTED. While the majority of Shields'

4    complaints regarding prison staff conduct do not bear on his current claims under § 2255, his

5    assertion that he was denied privileged telephone calls with his appellate counsel during the

6    pendency of his direct appeal is relevant to his ability to show cause and prejudice for procedural

7    default of certain claims. The Court therefore has considered Shields' brief and attached emails as

8    part of the record for purposes of evaluating his § 2255 Motion.

9                        *Materials Considered in Evaluating § 2255 Motion*

10           In summary, the Court's evaluation of Shields' § 2255 Motion is limited to the following

11   documents (including all attached exhibits): Shields' § 2255 Motion filed at ECF 462; Shields'

12   supporting Memorandum filed at ECF 465[3]; Shields' Motion to Clarify and Supplement

13   ("Supplement") filed at ECF 486; the Government's Response in Opposition ("Opposition") filed

14   at ECF 497; Shield's Final Reply ("Reply") filed at ECF 523; and Shields' Motion to Supplement

15   the Record filed at ECF 525.

16   **II.     LEGAL STANDARD**

17           A prisoner in federal custody may move to vacate, set aside, or correct his sentence based

18   on a claim that "the sentence was imposed in violation of the Constitution or laws of the United

19   States, or that the court was without jurisdiction to impose such sentence, or that the sentence was

20   in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28

21   U.S.C. § 2255(a). "The range of claims which may be raised in a § 2255 motion is narrow."

22   *United States v. Wilcox*, 640 F.2d 970, 972 (9th Cir. 1981). To obtain relief, the defendant must

23   demonstrate the existence of an error of constitutional magnitude that had a "substantial and

24   injurious effect" on the jury's verdict. *United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir.

25   2003) (holding that § 2255 cases are subject to the harmless error standard set forth in *Brecht v.*

26

27   _____

28   [3] In prior orders, this Court referred to ECF 465 as a "declaration" because that is how the Clerk
     entered it on the docket. *See* Docket Entry for ECF 465. However, ECF 465 more properly is
     characterized as a memorandum in support of the § 2255 Motion.

*Abrahamson*, 507 U.S. 619, 623 (1993)).  The claimed error of law must be "a fundamental defect which inherently results in a complete miscarriage of justice."  *Davis v. United States*, 417 U.S. 333, 346 (1974) (internal quotation marks and citation omitted).

A defendant seeking relief under § 2255 is entitled to a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C.A. § 2255(a).  "An oral hearing is not necessary in all cases."  *United States v. Rodriguez-Vega*, 797 F.3d 781, 791 (9th Cir. 2015).  Frequently, an expansion of the record is sufficient to allow the district court to resolve the questions presented by a § 2255 motion.  *See id.* (district court did not abuse its discretion in failing to conduct an evidentiary hearing where expanded record provided adequate basis to resolve IAC claim).  Accordingly, an evidentiary hearing is required only if:  (1) the § 2255 movant alleges "specific facts which, if true, would entitle him to relief"; and (2) "the petition, files and record of the case cannot conclusively show that he is entitled to no relief."  *United States v. Howard*, 381 F.3d 873, 877 (9th Cir. 2004).

## III.  DISCUSSION

Shields' § 2255 Motion asserts the following claims:  (1) actual and factual innocence; (2) ineffective assistance of trial counsel based on failure to retain experts in real estate, banking, and finance; (3) *Brady* and *Napue* violations; (4) ineffective assistance of trial counsel on multiple grounds; and (5) due process violation based on trial counsel's refusal to permit Shields to attend a post-trial loss hearing.  Shields requests an evidentiary hearing on all claims.  To evaluate that request, the Court must determine whether Shields potentially could be entitled to relief or, alternatively, whether the filings and record in this case conclusively establish that Shields is entitled to no relief.  *See Howard*, 381 F.3d at 877.  The Court therefore considers the merits of Shields' claims before taking up his request for an evidentiary hearing.

The Court addresses Shields' actual innocence claim (Claim 1), followed by his government misconduct and due process claims (Claims 3 and 5), his IAC claims (Claims 2 and 4), and finally his request for an evidentiary hearing.

### A.  Freestanding Claim of Actual Innocence (Claim 1)

In Claim 1, Shields asserts that he is actually and factually innocent of all counts of

conviction, and that he did not participate in the criminal conduct of his co-defendants, Sims and Stafford. *See* § 2255 Motion at 5, ECF 462; Memorandum at 1-6, ECF 465. As discussed below, Shields has not met the extraordinarily high standard for establishing a freestanding claim of actual innocence. Shields appears to believe, mistakenly, that he can make out a freestanding claim of actual innocence by showing that the evidence is insufficient to support his conviction. As discussed below, a showing of insufficiency of the evidence is not enough to prevail on a freestanding actual innocence claim.

Even if the Court were to construe Claim 1 as a claim for insufficiency of the evidence rather than a freestanding claim of actual innocence, Shields would not prevail. As pointed out by the Government, Shields is barred from pursuing claims based on insufficiency of the evidence because such claims either were raised or could have been raised on direct appeal. Moreover, Shields has not demonstrated that there is insufficient evidence to support his conviction.

### 1. Legal Standard on Freestanding Claim of Actual Innocence

Neither the United States Supreme Court nor the Court of Appeals for the Ninth Circuit has resolved whether a freestanding claim of actual innocence is cognizable on collateral review. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable."). In *Herrera v. Collins*, 506 U.S. 390, 417 (1993), the Supreme Court assumed without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." The *Herrera* court indicated that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* In summarizing the standard applicable to a freestanding claim of actual innocence, assuming such a claim is cognizable, the Ninth Circuit has reiterated that "[t]he standard for establishing a freestanding claim of actual innocence is extraordinarily high" and the showing "would have to be truly persuasive." *Jones*, 763 F.3d at 1246 (internal quotation marks and citation omitted). "[A]t a minimum, the petitioner must go

1  beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably

2  innocent." *Id.* (internal quotation marks and citation omitted).

3  The Supreme Court has defined the standard for a freestanding actual innocence claim by

4  reference to the lower standard for a gateway claim of actual innocence under *Schlup v. Delo*, 513

5  U.S. 298 (1995). In *Schlup*, the Supreme Court held that a petitioner who otherwise would be

6  procedurally barred from presenting a constitutional claim may obtain review of the claim by

7  demonstrating actual innocence. *Schlup*, 513 U.S. at 314-15. "In order to pass through the *Schlup*

8  actual innocence gateway, a petitioner must demonstrate that in light of new evidence, it is more

9  likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable

10  doubt." *Jones*, 763 F.3d at 1247 (internal quotation marks, citations, and alterations omitted). The

11  new evidence must be reliable, and the reviewing court must consider all evidence (old and new)

12  to "make a probalistic determination about what reasonable, properly instructed jurors would do"

13  based on the total record. *Id.*

14  In *House v. Bell*, 547 U.S. 518, 555 (2006), the Supreme Court held that a freestanding

15  innocence claim "requires more convincing proof of innocence than *Schlup*." The Supreme Court

16  concluded that although House had "cast considerable doubt on his guilt – doubt sufficient to

17  satisfy *Schlup's* gateway standard for obtaining federal review despite a state procedural default,"

18  he had not met the standard for a freestanding actual innocence claim. *House*, 547 U.S. at 554-

19  555. The Ninth Circuit reached a similar conclusion in *Jackson v. Calderon,* 211 F.3d 1148, 1165

20  (9th Cir. 2000), holding that although Jackson's new medical evidence had "certainly cast doubt

21  on his conviction," he had not made the required showing of probable innocence. And in *Carriger*

22  *v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997), the Ninth Circuit denied an actual innocence claim

23  based on another suspect's reliable confession to the crime. The Ninth Circuit held that,

24  "[a]lthough the postconviction evidence he presents casts a vast shadow of doubt over the

25  reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial,

26  not affirmatively to prove Carriger's innocence." *Id.*

27  ### 2.  Shields' Freestanding Claim of Actual Innocence

28  Applying these authorities here, it is clear that Shields' freestanding actual innocence claim

United States District Court
Northern District of California

is without merit. The cases discussed above contemplate that a freestanding claim of actual innocence may lie where new evidence shows that the defendant is probably innocent. Shields' claim is not grounded in new evidence, however. Shields instead argues that the evidence presented at trial was insufficient to support his conviction, relying on *United States v. McCray*, 584 F. App'x 686, 687 (9th Cir. 2014). In *McCray*, the Ninth Circuit reversed the district court's denial of the defendant's § 2255 motion regarding two counts of promotional money laundering, finding that the promotional money laundering counts merged into wire fraud counts. *See McCray*, 584 F. App'x at 687. The Ninth Circuit also found that there was insufficient evidence to support conviction on the promotional money laundering counts: "[B]ecause the government did not show that the Bermuda Transfers involved profits from McCray's scheme, his promotional money laundering convictions cannot stand." *Id.* Shields argues that his situation is identical to that of the defendant in *McCray*, asserting that "because the government did not show that investor funds were used, there is insufficient evidence to support Shields' conviction." Memorandum at 1, ECF 465.

To the extent Shields asserts a freestanding actual innocence claim, his reliance on *McCray* is misplaced because *McCray* did not involve such a claim.[4] In order to prevail on a freestanding actual innocence claim, "the required showing of probable innocence . . . contemplates *a stronger showing than insufficiency of the evidence to convict*." *Jackson*, 211 F.3d at 1165 (internal quotation marks and citation omitted, emphasis added). Thus, Shields cannot prevail on a freestanding actual innocence claim based on asserted insufficiency of the evidence.

Shields' briefing on Claim 1 comprises dozens of assertions that the evidence is insufficient to support his conviction. A small sample is set forth here by way of illustration: "The government is actually and factually just plain wrong regarding their theory and conclusions of Shields' involvement in any scheme to defraud," Memorandum at 1, ECF 465; "Therefore in

---

[4] In *McCray*, the Ninth Circuit found that procedural default with respect to claims relating to the promotional money laundering counts was excused, because McCray had demonstrated gateway actual innocence under *Schlup*. *See McCray*, 584 F. App'x at 688. The *McCray* court did not discuss the legal standard for a freestanding actual innocence claim, and it does not appear from the decision that McCray raised such a claim.

light of all the evidence no reasonable juror would have been able to conclude beyond a reasonable doubt that Shields knowingly used investor money 'as he saw fit,'" *id*.; "The evidence clearly proved and the jury confirmed there was no scheme to defraud, by acquitting CD Sims on all counts except his admitted wrong doing in dealing with the Kaanapu's," *id*. at 2; and "Based on evidence, Petitioner is actually and factually innocent because CD Stafford's testimony disproved the Government's original theory of fraud," *id*. at 6. In his Reply, Shields sets forth his own version of the facts in a lengthy narrative. *See* Reply at 2-14, ECF 523.

Speculating about the reasons why the jury might have wrongfully convicted him, Shields suggests that "Judge Whyte's decision to require Christmas Eve deliberations caused the jury to quickly decide Shields' guilt as to his counts without proper deliberation," Reply at 16, ECF 523; "it could have been the government's Brady violations, 'daily document dumps' or Nolan's ineffectiveness that caused the jury to convict an innocent man of conduct that was not a crime," *id*. at 31; or "the jury could have wrongfully convicted Shields of a crime because the government suborned perjury by allowing Kathy Comer to submit fraudulent testimony," *id*. 33.

Shields' arguments and speculations do not establish freestanding actual innocence under the standard set forth in *House* and *Jones*. Shields has not submitted evidence casting doubt on his conviction as required to show gateway actual innocence, let alone evidence demonstrating his probable innocence as required to show freestanding actual innocence. No exhibits are attached to Shields' § 2255 Motion or Supplement. *See* § 2255 Motion, ECF 462; Supplement, ECF 486. The exhibits to Shields' Memorandum appear to be excerpts of briefs discussing testimony and arguments presented at trial, and copies of warranty deeds issued in some of the transactions giving rise to the charges in this case. *See* Memorandum Exhs. A-G, ECF 465. The exhibits to Shields' Reply include his motion for an evidentiary hearing and new trial, his declaration dated September 26, 2018, correspondence to his appellate counsel during the pendency of his direct appeal, and correspondence to his trial counsel, Mr. Nolan, prior to the post-trial loss hearing conducted by Judge Whyte. *See* Reply Exhs. A-D, ECF 523. Although Shields' declaration and correspondence to his appellate counsel post-date the judgment, and thus technically constitute "new" evidence, neither identifies any facts regarding the transactions giving rise to Shields'

conviction that could not have been proffered at trial.  Shields' correspondence to his trial counsel regarding the post-trial loss hearing likewise does not contain new evidence.  In short, the documents attached to Shields' filings do not constitute the type of new evidence contemplated by the Supreme Court and Ninth Circuit in the authorities discussed above, *e.g.*, new medical evidence or new confession to crime by another.

Accordingly, Shields' freestanding claim of actual innocence (Claim 1) is DENIED.

### 3. Insufficiency of the Evidence

Although Claim 1 is titled as claim for "Actual and Factual Innocence," it appears from Shields' arguments that he may have intended to bring a claim of insufficiency of the evidence rather than a freestanding claim of actual innocence.  When evaluating a claim of insufficiency of the evidence to support a conviction, the reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The Government argues that Shields is barred from pursuing claims based on insufficiency of the evidence, because such claims either were raised or could have been raised on direct appeal.  The Government also argues that Shields would not be entitled to relief even if his claim of insufficiency of the evidence were considered on the merits.  The Court agrees with the Government on both points.

### a. Claims Raised on Direct Appeal

"When a defendant has raised a claim and has been given a full and fair opportunity to litigate it on direct appeal, that claim may not be used as basis for a subsequent § 2255 petition." *United States v. Hayes*, 231 F.3d 1132, 1139 (9th Cir. 2000); *see also United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010) ("§ 2255 may not be used as a chance at a second appeal."); *Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972) ("The law in this circuit is clear that when a matter has been decided adversely on appeal from a conviction, it cannot be litigated again on a 2255 motion.").  In those circumstances, the appellate decision is law of the case. *See Hayes*, 231 F.3d at 1139.  "Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."

*United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (internal quotation marks and citation omitted). "A collateral attack is the 'same case' as the direct appeal proceedings for purposes of the law of the case doctrine." *Id.* at 500.

Shields challenged the sufficiency of the evidence on direct appeal with respect to Counts 2, 3, 6, 8, 16, 17, and 36, asserting that "there was insufficient evidence that he engaged in a scheme to defraud, had the intent to defraud, or made fraudulent statements or omissions." *Shields II*, 673 F. App'x at 629. The Ninth Circuit rejected Shields' challenge, finding that "[a] rational jury could conclude that the challenged counts were supported by the fact that investors' funds were solicited for specific projects, when Shields (the primary S3 money manager) knew and intended that the funds would be used for other purposes." *Id.* With respect to Shields' argument that his liability as a co-conspirator was negated by the fact that certain emails were sent by Stafford to investors after Shields' relationship with Stafford had soured, the Ninth Circuit found that "while there may be evidence of problems between Shields and Stafford, a jury could reasonably conclude that Shields had not withdrawn from the conspiracy." *Id.* The Ninth Circuit noted that "Defendants focus on highlighting evidence favorable to them, or on arguing that evidence against them supports different inferences, but it is not our task to ask whether a finder of fact *could have construed* the evidence produced at trial to support acquittal." *Id.* (internal quotation marks and citation omitted, emphasis added). The Ninth Circuit emphasized that "[e]vidence is sufficient to support a conviction unless, viewing the evidence in the light most favorable to sustaining the verdict, *no rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted, emphasis added).

Shields therefore is precluded from pursuing a claim of insufficiency of the evidence as to Counts 2, 3, 6, 8, 16, 17, or 36 in these § 2255 proceedings.

### b.    Claims Not Raised on Direct Appeal

To the extent Shields may be claiming insufficiency of the evidence with respect to other counts, any such claims are procedurally defaulted because they could have been raised on direct appeal. "Section 2255, however, is not designed to provide criminal defendants multiple

opportunities to challenge their sentence." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993). "To challenge a conviction in a § 2255 proceeding based upon a claim of error that could have been raised on direct appeal but was not, a defendant must demonstrate both cause to excuse the procedural default, as well as actual prejudice resulting from that error." *United States v. Seng Chen Yong*, 926 F.3d 582, 590 (9th Cir. 2019). Alternatively, procedural default may be excused if the defendant shows gateway actual innocence under *Schlup*. *See Bousley v. United States*, 523 U.S. 614, 623 (1998).

"[T]he question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington*, *supra*, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." *Id.* "Generally, to demonstrate cause for procedural default, an appellant must show that some objective factor external to the defense impeded his adherence to the procedural rule." *United States v. Skurdal*, 341 F.3d 921, 925 (9th Cir. 2003) (internal quotation marks and citation omitted). Such factors might include "a showing that the factual or legal basis for a claim was not reasonably available to counsel," or that "some interference by officials" caused the default. *Murray*, 477 U.S. at 488.

To demonstrate prejudice, the defendant must show "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Braswell*, 501 F.3d 1147, 1150 (9th Cir. 2007) (internal quotation marks and citation omitted).

Shields has not shown cause. He was represented on appeal by Erick Guzman, who argued insufficiency of the evidence as to some counts, and Shields does not explain why Mr. Guzman could not have made the argument as to all counts. Shields has not asserted an IAC claim with respect to Mr. Guzman, so even if Mr. Guzman erred in failing to argue insufficiency of the evidence as to all counts, Shields is bound by that error. *See Murray*, 477 U.S. at 488 (where defendant is represented by constitutionally effective counsel, defendant bears the risk of an

1    attorney error that results in procedural default). Shields likewise has not shown gateway actual

2    innocence under *Schlup* to excuse his procedural default. "In order to pass through the *Schlup*

3    actual innocence gateway, a petitioner must demonstrate that in light of new evidence, it is more

4    likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable

5    doubt." *Jones*, 763 F.3d at 1247 (internal quotation marks, citations, and alterations omitted). As

6    discussed above, Shields has not presented any new evidence that would meet this standard.

7    Accordingly, any insufficiency of the evidence claims not raised on direct appeal are procedurally

8    defaulted.

9           **c.**      **Merits of Insufficiency of the Evidence Claim**

10         Even if a claim of insufficiency of the evidence were considered on the merits, Shields

11    would not be entitled to relief. As noted herein, a defendant may establish a federal constitutional

12    violation arising from insufficiency of the evidence only by showing that, viewing the evidence in

13    the light most favorable to the prosecution, *no rational trier of fact* could have found the essential

14    elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. As noted above,

15    the trial in this case lasted seven weeks, during which the Government presented testimony from

16    almost forty witnesses, including Shields' former partner Stafford, the S3 Partners bookkeeper,

17    and numerous victims. The jury found the evidence compelling enough to convict Shields of 32

18    counts. Shields' subjective view of the evidence does not show that the jury's verdict was

19    irrational. Moreover, Shields' argument that his conviction for conspiracy cannot stand in light of

20    Sims' acquittal on the conspiracy count is unsupported by the law. Shields asserts that "CD Sims

21    was acquitted of all counts, with the exception of his admitted criminal conduct involving the

22    Kaanapu's." Memorandum at 2, ECF 465. Based on Sims' outcome, Shields argues that "[t]he

23    jury clearly rejected all of the governments fabricated theories and false narratives of a scheme to

24    defraud." *Id*. However, as the Government points out, "[i]t is well established that a person may

25    be convicted of conspiring with a co-defendant even when the jury acquits that co-defendant of

26    conspiracy." *United States v. Ching Tang Lo*, 447 F.3d 1212, 1226 (9th Cir. 2006). Thus, Sims'

27    acquittal on the majority of the counts does not undermine Shields' conviction.

28         Accordingly, to the extent Shields intended Claim 1 to assert insufficiency of the evidence,

the claim is DENIED.

**B.    Government Misconduct and Due Process Claims (Claims 3 and 5)**

In Claim 3, Shields asserts that the Government withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and presented perjured testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).  In Claim 5, Shields asserts that his absence from the post-trial loss hearing violated his Due Process rights and Federal Rule of Criminal Procedure 43.  The Government argues that Shields has procedurally defaulted those claims by failing to raise them on direct appeal, and that in any event the claims are not meritorious.  The Government's arguments are well-taken.

**1.    *Brady* Violations (Claim 3)**

In Claim 3, Shields asserts that the Government withheld exculpatory evidence in violation of *Brady*.  To establish a *Brady* violation, a defendant must show:  "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Shields asserts that the Government violated *Brady* by means of "daily document dumps" during trial "which defense counsel never had the opportunity to even read or review, let alone investigate prior to developing a strategy, prior to trial."  § 2255 Motion at 7, ECF 462; Memorandum at 7, ECF 465.  Shields also claims that the Government submitted three binders of new documents at the post-trial loss hearing.  *See* § 2255 Motion at 7.  Because the *Brady* claim is based on conduct that occurred during trial and post-trial proceedings, *i.e.*, before judgment, the claim could have been raised on direct appeal.  It was not.  Accordingly, the *Brady* claim is procedurally defaulted unless Shields demonstrates cause and prejudice, or gateway actual innocence under *Schlup*.  Shields has not demonstrated gateway actual innocence under *Schlup*, as discussed above.

Shields does not address the cause and prejudice requirements at all in his § 2255 Motion, Memorandum, or Supplement.  *See* § 2255 Motion, ECF 462; Memorandum, ECF 465; Supplement, ECF 486.  Shields responds to the Government's arguments on the cause and

prejudice requirements in his Reply, suggesting that prison staff caused him to default the *Brady* claim by preventing Shields from having "privileged communications" with his appellate counsel, Mr. Guzman. *See* Reply at 20, ECF 523. Shields makes the same assertion in his declaration attached to his Reply, and in his Motion to Supplement the Record. *See* Def.'s Decl. at 1, Exh. B to Reply, ECF 523-2; Motion to Supplement the Record, ECF 525. It appears that Shields uses the phrase "privileged communications" to refer to unmonitored telephone calls. *See* Reply at 20, Def.'s Decl. at 1; Motion to Supplement the Record at 1-2.

As noted above, interference by officials may satisfy the cause prong of the procedural default analysis. *See Murray*, 477 U.S. at 488. However, Shields does not explain why Mr. Guzman could not raise the *Brady* claim on direct appeal absent the "privileged communications" that prison staff allegedly prevented. Under Shields' recitation of facts, Mr. Guzman could have arranged telephone calls with Shields that were not "privileged communications." *See* Motion to Supplement at 2 (explaining that appellate counsel could arrange for call with Shields but it would not be private) ECF 525. Nothing in Shields' submissions indicates that Mr. Guzman could not visit Shields personally if he felt it necessary. Accordingly, even accepting Shields' representations regarding his inability to make outgoing calls to Mr. Guzman, and the prison's refusal to allow unmonitored telephone calls, Shields has not shown that Mr. Guzman was prevented from raising a *Brady* claim on direct appeal.

Moreover, Shields makes clear that he was in contact with Mr. Guzman during the pendency of his appeal, at least via written correspondence. Shields sent Mr. Guzman multiple lengthy letters after the opening brief on appeal was filed but before briefing was completed, advising Mr. Guzman of all claims asserted in the present § 2255 Motion and providing additional details regarding the pending appellate claims. *See* Reply at 22 ("Once Petitioner received a copy of Guzman's opening brief, and became aware of the claims that Guzman had advanced, Petitioner immediately prepared and mailed several lengthy letters, laying out the same claims that Petitioner has now advanced in his 2255 Motion and notified Guzman of much added detail pertaining to the Due Process claim Guzman had advanced in the Direct Appeal."); *see also* Def.'s Decl. at 1. Had Mr. Guzman believed that the information conveyed in Shields' letters warranted the assertion of

19

additional claims on appeal, he could have made an appropriate motion to amend the opening brief in the appellate court. *See, e.g., Keiper v. Venta*, 670 F. App'x 529, 530 (9th Cir. 2016) (granting plaintiff-appellant's request to supplement and amend opening brief on appeal); *United States v. Norales*, 597 F. App'x 463, 464 (9th Cir. 2015) (granting stay of proceedings to allow defendant-appellant to supplement or amend opening brief on appeal).

Moreover, Shields states that Mr. Guzman identified claims for appeal by reviewing transcripts of the trial and sentencing hearing. *See* Reply at 22. According to Shields, "[i]t is clear that the government violated Brady multiple times during trial. It is clear that defense counsel complained openly on the record, on multiple occasions." Reply at 55, ECF 523. Shields states specifically that co-trial counsel, Ms. Kieval, "complained openly on-the-record on more than 10 instances" regarding the asserted *Brady* violations. Reply at 56, ECF 523. The trial transcript reflects that defense counsel objected to the document dumps during trial. *See* GER 784-99, 843-47, 949-50. Shields in fact concedes that the *Brady* claim was "known to his appellate counsel." Reply at 22. If the *Brady* violation was apparent from the record, and known to Mr. Guzman, Mr. Guzman could have raised the claim on direct appeal whether or not he had privileged communications with Shields. Shields makes a passing suggestion that Mr. Guzman may have provided ineffective representation, but Shields has not asserted an IAC claim with respect to Mr. Guzman or fleshed out that assertion in any meaningful way. *See* Reply at 20, ECF 523. The Court concludes that Shields has not demonstrated cause for the procedural default of his *Brady* claim.

Even if Shields had established cause (and he has not), he has not established prejudice. In addressing the defendant's showing of prejudice in *Strickler*, the Supreme Court held that "unless those documents were 'material' for Brady purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default." *Strickler*, 527 U.S. at 282. In order to demonstrate materiality, the defendant had to show that there was a "reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id*. at 289. The Supreme Court held that "[P]etitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different had these

United States District Court
Northern District of California

materials been disclosed. He therefore cannot show materiality under *Brady* or prejudice from his failure to raise the claim earlier." *Id*. at 296.

In the present case, Shields has not shown a reasonable probability that the result of the trial would have been different had the materials in the "document dumps" been provided to the defense earlier. He has not identified specific exculpatory or impeaching documents that would have countered the weeks of evidence that led the jury to find him guilty on 32 counts. Moreover, when interviewed by the FBI, Shields' trial attorney, Thomas Nolan, stated that he was able to revise his trial strategy as he received materials from the Government. *See* Nolan 302, Exh. C to Opposition, ECF 497-3.

Accordingly, to the extent that Claim 3 is based on an asserted *Brady* violation, the claim is DENIED as procedurally defaulted and without substantive merit.

### 2. Napue Violations (Claim 3)

Shields also asserts in Claim 3 that the Government presented perjured testimony at trial in violation of *Napue*. "To establish a *Napue* violation, a defendant must show: (1) that the testimony was actually false, (2) that the government knew or should have known that it was false, and (3) that the testimony was material, meaning there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014).

Shields claims that "[t]he government knowingly solicited perjured testimony from witness Kathy Comer regarding signatures and invoices on Oakmont loan documents." § 2255 Motion at 7, ECF 462. As noted above, Ms. Comer was a bookkeeper for S3 Partners. She testified that investors' money was mishandled by Shields and his partners. *See* GER 1695-1828. Shields asserts that he did nothing wrong, and that Ms. Comer lied about everything. According to Shields, Ms. Comer "opened every account, maintained signature authority on all accounts, at all times and disbursed all funds check or wire transfer from all accounts." Memorandum at 7, ECF 465. Shields claims that Ms. Comer forged another's name on Oakmont loan documents, overcompensated herself by more than $5,000, and mishandled $200,000 belonging to Shields by wiring the funds to Sims' company without Shields' permission. *Id*. Shields states that Ms.

United States District Court
Northern District of California

Comer perjured herself at trial "in an attempt to shift blame, from her admitted wrong doing, and to focus rather on Mr. Shields," and that the Government knowingly presented the perjured testimony. *Id*. Because the *Napue* claim is based on conduct that occurred during trial, the claim could have been raised on direct appeal. It was not. Accordingly, the *Napue* claim is procedurally defaulted unless Shields demonstrates cause and prejudice, or gateway innocence under *Schlup*. Shields has not demonstrated gateway actual innocence under *Schlup*, as discussed above.

Shields does not address cause and prejudice in his § 2255 Motion, Memorandum, or Supplement. *See* § 2255 Motion, ECF 462; Memorandum, ECF 465; Supplement, ECF 486. In his Reply, Shields asserts that prison staff caused him to default the *Napue* claim by preventing him from having privileged communications with his appellate counsel, Mr. Guzman. *See* Reply at 20, ECF 523. This is the same cause for default asserted with respect to Shields' *Brady* claim, and it fails for the same reasons. Shields has not established that Mr. Guzman could not have called or visited Shields if Mr. Guzman felt he needed more information to draft the appeal. Also, Shields concedes that he sent numerous lengthy letters to Mr. Guzman during the pendency of his direct appeal, setting out the same claims asserted in the present § 2255 Motion. *See* Reply at 22. The asserted perjury would have been apparent to Shields during trial, and thus presumably was communicated to Mr. Guzman under Shields' own recitation of events. Shields therefore has not shown that Mr. Guzman's failure to raise the *Napue* claim on direct appeal was due to a factor external to the defense, *i.e.*, the conduct of prison staff. *See Skurdal*, 341 F.3d at 925.

Even if Shields had established cause (and he has not), he has not established prejudice. To do so, Shields would have to show "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Braswell*, 501 F.3d at 1150. Shields has not testimony was false or that the Government knew it was false. He devotes several pages of his Reply to summarizing Ms. Comer's allegedly false testimony and the Government's knowledge of the falsity. *See* Reply at 62-70. To take one example, Shields argues that "Comer did not place S-3 Partners funds, into Kingsmen ALF's checking account, and then further transfer those (S-3) funds into Blanchat's account, as she falsely stated (GER 1789 at 13-20)." Reply at 62

(punctuation as in original). Shields argues further that "[i]n fact, the government knew this to be untrue from the closing documents, wire receipts, 1031 transaction reports, and mostly their own FINRA expert witness, that traced the funds." *Id.* Shields supports his Reply arguments with his own declaration statements. *See* Def.'s Decl. at 1-2, Exh. B to Reply, ECF 523-2. Shields' bare assertions that Ms. Comer was lying, and that the Government knew it, do not provide an adequate basis for his *Napue* claim.

To the extent that Claim 3 is based on an asserted *Napue* violation, the claim is DENIED as procedurally defaulted and without substantive merit.

### 3. Due Process Violation (Claim 5)

In Claim 5, Shields contends that his Due Process rights were violated when he was excluded from a critical stage of the proceedings. "Under the Fifth Amendment's Due Process Clause, a defendant has the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *United States v. McChesney*, 871 F.3d 801, 808 (9th Cir. 2017) (internal quotation marks and citation omitted). Shields asserts that his trial counsel, Mr. Nolan, refused to permit him to attend the post-trial loss hearing, which Shields characterizes as a critical stage of the process. In his Supplement, Shields adds a claim of denial of Due Process based on a conflict that Mr. Nolan allegedly created between himself and co-counsel, Ms. Kieval. *See* Supplement at 1, ECF 486.

#### a. Absence from Loss Hearing

Shields could have raised his Due Process claim based on his absence from the loss hearing on direct appeal. In fact, his direct appeal included a Due Process claim based on his absence from two pretrial conferences. *See Shields II*, 673 F. App'x at 628 ("Shields argues that he was denied this right when he was not present at two pretrial conferences between the court and counsel, at which government funding and a possible continuance of the trial were discussed."). The Ninth Circuit found that Due Process claim to be without merit, holding that "Shields validly waived his right to be present at these conferences, and the district court accepted his waiver." *Id*. As set forth above, Shields requested and was granted a waiver of his personal appearance with respect to "the hearing of any motion or other proceeding in the above-captioned case, including,

but not limited to, when the case is set for trial, when a continuance is ordered, and when any other action is taken by the court before or after trial, except upon arraignment, plea, any proceeding on a motion that will involve an evidentiary hearing, impanelment of jury, trial, and imposition of sentence." Order Granting Applic. for Waiver of Personal Appearance, ECF 61. Because Shields also could have raised his current Due Process claim on direct appeal, the claim is procedurally defaulted unless Shields demonstrates cause and prejudice, or gateway innocence under *Schlup*. Shields has not demonstrated gateway actual innocence under *Schlup*, as discussed above.

Shields does not address cause and prejudice requirements in his § 2255 Motion, Memorandum, or Supplement. *See* § 2255 Motion, ECF 462; Memorandum, ECF 465; Supplement, ECF 486. In his Reply, Shields asserts that there was no way for him to know that his absence from the loss hearing was a Due Process violation or to communicate the facts of the potential claim to Mr. Guzman once he learned them. "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel" may constitute adequate cause for procedural default. *See Murray*, 477 U.S. at 488. However, Shields' assertions are belied by his own submissions.

With respect to Shield's argument that he did not understand during the appellate process that his absence from the loss hearing constituted a denial of due process, Shields attaches to his Reply an email he wrote to Mr. Nolan a few days before the loss hearing, stating "Since I am not coming to the hearing I wanted to put down some thoughts about the loss figures that may be useful in the loss hearing." *See* Email, Exhibit D to Shields' Reply, ECF 523-4. Shields stated "As you know I believe this to be my strongest points as I did not raise any of the funds, I did contribute 100's and 100's of thousands of dollars after the 5-3 split." *Id.* Shields then went on for several pages, setting forth his versions of numerous transactions in the case, providing figures he believed to be important, and stating his view he was owed more than $700,000. *See id.* This email reflects that Shields understood the importance of the loss hearing before it occurred. He clearly knew that he was not present at the hearing.

With respect to his assertion that he had no way to communicate the facts underlying his current Due Process claim to Mr. Guzman, Shields has not established that the prison precluded all

access between himself and Mr. Guzman, as discussed above.  For example, Shields has not

indicated that Mr. Guzman could not have made telephone calls to Shields or visited him.

Additionally, Shields concedes that he was able to communicate with Mr. Guzman by letter

throughout the appellate process.  In fact, Shields attaches to his Reply a letter that he sent Mr.

Guzman, stating as follows:  "I've been spending much time reviewing my appeal and looking at

the law library.  So far I have discovered one issue that may be of help that was not included in the

record.  *It pertains to issue number 4 and the validity of the waiver.*"  Letter, Exh. C to Reply, ECF

523-3 (emphasis added).  Shields then went on to inform Mr. Guzman that he signed the waiver of

appearance "under duress."  *Id*.  Shields states that he sent multiple letters to Mr. Guzman during

the pendency of the appeal, "laying out the same claims that Petitioner has now advanced in his

2255 Motion."  See Reply at 22, ECF 523.

Given that a Due Process claim based on absence from pretrial hearings had been raised on

appeal, and Shields' communications with Mr. Guzman during the pendency of the appeal, it is

unclear why Mr. Guzman could not have sought to amend his opening brief to raise the present

Due Process claim on direct appeal.  Shields thus has not shown that the failure to raise the current

Due Process claim was due to a factor external to the defense.  *See Skurdal*, 341 F.3d at 925.

Even if Shields had demonstrated cause (and he has not), he has not demonstrated

prejudice.  As the Government points out, the Ninth Circuit expressly rejected Shields' appellate

Due Process claims based on its determination that he validly waived his personal appearance at

the proceedings in question.  *See Shields II*, 673 F. App'x at 628.  Shields suggests that the Ninth

Circuit would have reached a different result if informed of his contention that he signed the

waiver under duress.  However, Shields informed Mr. Guzman of his duress contention during the

pendency of the appeal.  *See* Shields Decl. at 1, Exh. B to Reply, ECF 523-2; Letter, Exh. C to

Reply, ECF 523-3.  Mr. Guzman either declined to raise that contention to the Ninth Circuit, or he

did and the Ninth Circuit nonetheless found that the waiver was valid.  On this record, Shields has

failed to show prejudice.  There is no indication that his Due Process claim could have prevailed if

not defaulted.

Accordingly, to the extent that Claim 5 is based on an Due Process violation arising from

25

1   Shields' absence from the loss hearing, the claim is DENIED as procedurally defaulted and

2   without substantive merit.

3                   **b.      Conflict between Mr. Nolan and Ms. Kieval**

4          Shields asserts that Mr. Nolan violated his Due Process rights by creating a conflict of

5   interest with co-counsel, Ms. Kieval.  According to Shields, Mr. Nolan treated Ms. Kieval poorly

6   during the trial, criticizing her and embarrassing her, so that she terminated her employment and

7   was not available to represent Shields at the loss hearing.  Shields believes that Ms. Kieval would

8   have done a better job of representation at the loss hearing.  *See* Supplement, ECF 486.

9          Shields does not cite any authority for the proposition that the type of clash he describes

10  could be a violation of his Due Process rights.  Moreover, Mr. Nolan stated in his FBI interview

11  that Ms. Kieval was looking for a new job during the trial, and left when she obtained one.  *See*

12  Nolan 302 at 5-6, Exh. C to Opp., ECF 497-3.  Mr. Nolan also stated that she worked on Shields'

13  case the entire time she was at Mr. Nolan's firm and after she left.  *See id.*  Mr. Shield's

14  speculation that the alleged conflict between counsel caused Ms. Kieval to leave is unsupported.

15          To the extent Claim 5 is based on an alleged conflict between counsel, the claim is

16  DENIED.

17          **C.      IAC Claims (Claims 2 and 4)**

18         In Claim 2, Shields asserts that his trial counsel, Mr. Nolan, was ineffective for failing to

19  call or consult with experts in real estate, banking, and finance.  In Claim 4, Shields asserts that

20  Mr. Nolan was ineffective because he:  (1) developed trial strategy before reviewing the evidence,

21  facts, and law, and refused to read a juror's note, which created a conflict of interest because

22  Shields wanted to read the note; (2) developed a trial strategy prior to receiving all material

23  evidence from the Government; (3) opposed co-counsel's pretrial request for a continuance; (4)

24  refused to permit Shields to attend "post-trial loss/sentencing and motion for acquittal hearings";

25  (5) failed to request a downward departure for time served; (6) improperly had the record stricken

26  to remove Shields' $500,000 contribution from the Presentence Report at the sentencing hearing;

27  and (7) failed to move the Court for an acquittal notwithstanding the verdict at the final sentencing

28  hearing.  *See* § 2255 Motion at 9, ECF 463.

### 1.     Legal Standard

In *Strickland v. Washington*, 466 U.S. 668, 684 (1984), the Supreme Court "recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." "[T]he right to counsel is the right to the effective assistance of counsel." *Id*. at 686 (internal quotation marks and citation omitted). The *Strickland* court articulated a two-prong test for evaluating a claim of ineffective assistance of counsel. First, the defendant must establish that counsel's performance fell below an objective standard of reasonableness. *Id*. at 688. Second, the defendant must establish prejudice resulting from counsel's deficient performance. *Id*. at 694.

To show deficient performance under the first prong, the defendant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight." *Id*. To show prejudice under the second prong, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

### 2.     Shields does not Challenge Ms. Kieval's Performance

Shields challenges only the performance of lead trial counsel, Mr. Nolan. He has stated expressly that he does not assert that he received ineffective assistance from co-counsel, Ms. Kieval. *See* Supplement at 1-3, ECF 468. Shields appears to be entirely satisfied with the representation he received from Ms. Kieval, stating that she mounted a "vigorous defense" of Shields. *Id*. at 1. The Government argues that under these circumstances, Shields cannot maintain his IAC claims against Mr. Nolan, because there is no authority for the proposition that a defendant is entitled to *two* effective attorneys.

While the Government's argument has intuitive appeal, it does not appear to be supported by published Supreme Court or Ninth Circuit authority. The Government relies on an unpublished decision of the Ninth Circuit, *Soraich v. Montana*, 264 F. App'x 654 (9th Cir. 2008), and an

unpublished district court decision from the Western District of Texas, *Brown v. Dretke*, No. CIV.A.SA01CA0241-XR, 2004 WL 2793266 (W.D. Tex. Dec. 3, 2004).

In *Soraich*, the habeas petitioner conceded that he had procedurally defaulted his claim that appellate counsel was ineffective, but he argued that the default was excused because his post-conviction attorney also had served as appellate counsel and therefore had a conflict of interest. *Soraich*, 264 F. App'x at 655-56. The Ninth Circuit rejected the petitioner's argument, noting that "Soraich had two post-conviction attorneys, only one of whom served as direct appellate counsel. . . . Soraich's second, conflict-free attorney could have amended Soraich's post-conviction petition to include a claim of ineffective assistance of appellate counsel within the appropriate limitations period, but did not." *Id*. at 656.

In *Brown*, the habeas petitioner asserted ineffective assistance of lead trial counsel based in part on counsel's absence during significant portions of the *voir dire* and direct examination of a prosecution witness. *Brown*, 2004 WL 2793266, at *37. The district court found that the petitioner could not establish ineffective assistance, because petitioner was represented by co-counsel during the periods in which lead counsel was absent. *Id*.

While *Soraich* and *Brown* provide some support for the Government's position, neither case provides a solid basis for wholesale denial of Shields' IAC claims against Mr. Nolan. The Court therefore turns to those claims.

### 3. Failure to Call or Consult with Experts (Claim 2)

In Claim 2, Shields contends that Mr. Nolan was ineffective because he did not call or consult with experts in real estate, banking, and finance. *See* § 2255 Motion at 6, ECF 462. Shields argues that "[a]n expert clearly would have demonstrated to the jury and the court that there was no fraud in this case, regarding petitioner." *Id*. Shields also argues that "[h]ad counsel Nolan been effective he would have called a Real Estate Expert Witness who would have testified that the Whiteside's, Kaanapu's, and Hruby's were bona-fide PURCHASERS, of real land not investors in Alafia." Memorandum at 6, ECF 465. Shields contends that an expert would have completely rebutted the Government's case. *See id*. at 6-7.

Mr. Nolan stated in his FBI interview that he spent a substantial amount of time trying to

28

find experts in both real estate and banking.  *See* Nolan 302 at 2, Exh. C to Opp., ECF 497-3.  In

particular, Mr. Nolan reached out to Jerry Klein of The Chatham Group, a clearing house of

experts.  *Id*.  Mr. Nolan had used Jerry Klein to find experts in other cases for many years.  *Id*.

Mr. Nolan wrote Mr. Klein a three-page letter prior to trial, describing the charges against Shields

and asking for help finding an expert.  *See* Letter, Exh. D to Opp., ECF 497-4.  Mr. Nolan also

asked whether Mr. Klein could suggest other means for finding an appropriate expert.  *See id.*

However, Mr. Nolan could not find an expert.  *See* Nolan 302 at 2, Exh. C to Opp., ECF 497-3.  In

Mr. Nolan's view, his inability to retain an expert was not related to payment issues.  *Id*.  Mr.

Nolan stated that the case simply did not lend itself to finding an expert favorable to Shields.  *Id*.

Finally, Mr. Nolan indicated that no expert properly could have testified as to legal conclusions as

asserted by Shields, such as that there was no fraud in the case.  *Id*. at 2-3.

Shields argues in his Reply that Mr. Nolan's efforts were inadequate, because Mr. Nolan's

letter to Mr. Klein was dated September 24, 2013, little more than a month before trial

commenced on November 5, 2013.  *See* Letter, Exh. D to Opp., ECF 497-4.  Shields assumes

based on the date of the letter that Mr. Nolan did not spend any time looking for experts before

reaching out to Mr. Klein.  Shields suggests that Mr. Nolan could not have hoped to find an expert

through Mr. Klein, given that the letter explained that it was a court appointed case and funding

was limited.  *See id.*  In Shields' view, Mr. Nolan should have begun looking for an expert sooner

and should have sought more time to find an expert by joining in the request for trial continuance

made by Shields' co-defendant, Mr. Simms, instead of opposing the request as discussed below.

Mr. Nolan "cannot be deemed ineffective because, with the benefit of hindsight, we now

determine that other trial strategies . . . may have been a better choice."  *Turner v. Calderon*, 281

F.3d 851, 876 (9th Cir. 2002).  "*Strickland* does not guarantee perfect representation, only a

reasonably competent attorney."  *Harrington v. Richter*, 562 U.S. 86, 110 (2011).  The record

reflects that Mr. Nolan tried to hire an expert at least a month prior to trial (and possibly before

that), but was unsuccessful.  Mr. Nolan reasonably could have believed that he had enough time to

retain an expert, and that Mr. Klein might be able to help him do so or suggest other means for

locating one.  Shields' conclusory assertions that Mr. Nolan should have done things differently

1    do not establish that Mr. Nolan's conduct "fell below an objective standard of reasonableness."

2    *Strickland* 466 U.S. 688.

3       Shields also has not demonstrated that the failure to retain a real estate or banking expert

4    caused him prejudice. Shields' assertion that such an expert could have rebutted the

5    Government's case is sheer speculation. In particular, Shields' assertion that an expert could have

6    testified to the legal conclusion that there was no fraud in the case is unsupported by the law. *See*

7    *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) ("[A]n expert witness cannot give an

8    opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.").

9       Accordingly, Claim 2 is DENIED.

10      **4.      Asserted Premature Development of Trial Strategy and Opposition to**

11      **Co-Defendant's Request for a Trial Continuance (Claim 4)**

12      In Claims 4(1) and 4(2), Shields contends that Mr. Nolan rendered ineffective assistance

13   by improperly developing a trial strategy prior to receiving all material evidence from the

14   Government. *See* § 2255 Motion at 9, ECF 462. In Claim 4(3), Shields contends that Mr. Nolan

15   rendered ineffective assistance by opposing the motion for a trial continuance made by Shields'

16   co-defendant, when such continuance would allow Mr. Nolan time to review the Government's

17   charts, consult experts, and develop a proper trial strategy. *Id*.

18      At his FBI Interview, Mr. Nolan stated that because the exhibit list in this case was huge,

19   comprising thousands of documents, he did not know what exhibits would be used by the

20   Government at what time. Nolan 302 at 4, Exh. C to Opp., ECF 497-3. Mr. Nolan stated that he

21   was able to constantly revise his trial strategy as he received materials from the government. *Id*.

22   As part of that strategy, Mr. Nolan called several witnesses to testify. *See* GER 2960-3073. Mr.

23   Nolan did not want a trial continuance because he was ready to proceed with trial. *Id*. Mr. Nolan

24   characterized these decisions as "strategy" and "tactical." *Id*. at 3-4.

25      Based on this record, Mr. Nolan reasonably could have determined that it made sense to

26   proceed with the trial and revise his trial strategy based on the Government's exhibits. A district

27   court need not determine the actual explanation for counsel's actions in order to conclude that the

28   petitioner has failed to show deficient performance, so long as counsel's actions fall within the

range of reasonable representation. *See Morris v. State of Cal.*, 966 F.2d 448, 456 (9th Cir. 1991).

Shields has not shown that Mr. Nolan's actions fell outside the range of reasonable representation

in this case. Nor has Shields shown that there is a reasonable probability that the trial result would

have been different had Mr. Nolan taken a different approach. *See Strickland*, 466 U.S. at 694 (To

show prejudice under the second prong, the defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different.").

Claims 4(1), 4(2), and 4(3) are DENIED as to these grounds.

### 5.    Decision Not to Read the Juror's Note / Conflict of Interest (Claim 4)

In Claim 4(1), Shields contends that Mr. Nolan's representation was deficient because Mr.

Nolan elected not to read a juror's note, which created a conflict of interest because Shields

wanted to read the note. *See* § 2255 Motion at 8, ECF 462; Memorandum at 8, ECF 465. Shields

raised this IAC claim regarding the juror note on direct appeal, but the Ninth Circuit dismissed it

after concluding that the record was not sufficiently developed to consider it. *See Shields II*, 673

F. App'x at 628-29. The record thereafter was expanded by submission of the Nolan 302, Shields'

declaration, and other evidence referenced herein, and the Court finds that determination of the

claim is appropriate based on the expanded record. *See Rodriguez-Vega*, 797 F.3d 791 (district

court did not abuse its discretion in failing to conduct an evidentiary hearing where expanded

record provided adequate basis to resolve IAC claim).

In his FBI Interview, Mr. Nolan stated that a juror had submitted a note to Judge Whyte

through a Marshal or bailiff. *See* Nolan 302 at 3, Exh. C to Opp., ECF 497-3. Only Judge Whyte

read the note, and he indicated that counsel did not need to read it. *See id.* Mr. Nolan stated that

his decision not to read the note was a tactical one, as he knows Judge Whyte well and Judge

Whyte had indicated that it was not in anyone's best interest for counsel to read the note. *Id.*

Shields states in his declaration that he wanted to read the note, as he thought it would reflect the

juror's impressions of Mr. Nolan at the start of trial. *See* Shields Decl. at 2, Exh. B to Reply, ECF

523-2. Shields does not provide any basis for his speculation that the note concerned Mr. Nolan.

*See id.* According to Shields, Mr. Nolan told him that if he (Mr. Nolan) pushed to read the note, it

31

1    would make Judge Whyte "very unhappy." *See id.* Mr. Nolan did not ask to read the note, nor did

2    the Government's counsel.

3        Shields has not shown that Mr. Nolan's decision not to read the note constituted deficient

4    performance. Mr. Nolan reasonably could have believed that it was prudent to defer to Judge

5    Whytes' opinion that counsel did not need to read the note, and that insisting on reading the note

6    would have angered Judge Whyte at the start of a lengthy trial. Shields has not established that

7    Mr. Nolan's actions fell outside the range of reasonable representation. *See Morris*, 966 F.2d at

8    456.

9        Claim 4(1) is DENIED on this basis.

10        **6.    Loss Hearing (Claim 4)**

11        In Claim 4(4), Shields asserts that Mr. Nolan rendered ineffective assistance by preventing

12    him from attending the post-trial loss hearing on September 23, 2014, and failing to rebut the

13    Government's evidence regarding loss calculations at the loss hearing.[5] *See* § 2255 Motion at 9,

14    ECF 462; Memorandum at 809, ECF 465.

15        In his FBI interview, Mr. Nolan stated that Shields chose not to attend the loss hearing.

16    *See* Nolan 302, Exh. C to Opp., ECF 497-3. Mr. Nolan believed that "a waiver was made to the

17    judge" about Shields' attendance, but he could not recall the details. *Id.* As noted above, Shields

18    in fact did execute a waiver of his right to appear at all court hearings "except upon arraignment,

19    plea, any proceeding on a motion that will involve an evidentiary hearing, impanelment of jury,

20    trial, and imposition of sentence." Order Granting Applic. for Waiver of Personal Appearance,

21    ECF 61. That waiver was accepted by Judge Whyte. *See id.*

22        Shields characterizes the loss hearing as the "critical first stage of petitioner's two part

23    sentencing." Reply at 17, ECF 523. He argues that as a sentencing hearing, the loss hearing did

24    not fall within the waiver, and therefore Mr. Nolan should have ensured his attendance. However,

25

26    _____
      [5] Shields' § 2255 Motion refers to the September 23, 2014 hearing as the "post-trial
27    loss/sentencing and motion for acquittal hearings." *See* § 2255 Motion at 9, ECF 462. As
      discussed in more detail below, Shields characterizes the loss hearing held September 23, 2014 as
28    a sentencing. It is not clear why Shields refers to the September 23, 2014 hearing as an "acquittal
      hearing."

Shields presents no evidence that anyone involved in the case – including Shields himself – viewed the loss hearing as a sentencing hearing in September 2014. At the start of the loss hearing, Mr. Nolan indicated that Shields' presence had been waived, which Judge Whyte accepted. *See* Loss Hrg. Tr. 3:21-22, ECF 416. The Minutes of the hearing reflect that "Defendant Shields [sic] appearance was previously waived." Minutes, ECF 319. When the Government's counsel informed Judge Whyte during the hearing that the daughter of one of the victims was present and wished to be heard, Judge Whyte questioned whether the loss hearing was the appropriate forum, asking "but isn't her testimony really relevant to the sentencing as opposed to the loss figure?" Loss Hrg. Tr. 33:9-14. Judge Whyte deferred the family member's testimony, stating "I think she should testify at sentencing." Loss Hrg. Tr. 35-22-23. Shields' own email to Mr. Nolan just a few days before the hearing referred to the proceeding as a "hearing" rather than a sentencing, made no mention of Shields' desire to attend, and thanked Mr. Nolan (twice) for his efforts. *See* Email, Exh. D to Reply, ECF 523-4. On this record, even if the Court were to agree in hindsight that the loss hearing could be viewed as a sentencing hearing, Mr. Nolan reasonably could have believed that the loss hearing fell within the scope of the waiver and thus that Shields' personal appearance was not required.

In his Reply, Shields contends that the waiver of his personal appearance was invalid because he signed it under duress. According to Shields, Mr. Nolan threatened that if Shields did not sign the waiver, his bond would be revoked and he would be taken into custody. *See* Reply at 71-72, ECF 523; Def.'s Decl. at 2, Exh. B to Reply, ECF 523-2. Shields' challenge to the validity of the waiver is precluded by the law of the case doctrine. In denying Shields' Due Process claims based on his absence from two pretrial hearings, the Ninth Circuit expressly held that the waiver was valid. *See Shields II*, 673 F. App'x at 628 ("Shields validly waived his right to be present at these conferences, and the district court accepted his waiver."). "Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (internal quotation marks and citation omitted). "A collateral attack is the 'same case' as the direct appeal proceedings for purposes of the law of the case doctrine." *Id.* at 500. During the

1    pendency of the appeal, Shields told his appellate attorney, Mr. Guzman, that he had signed the

2    waiver under duress. *See* Letter, Exh. C to Reply, ECF 523-3. Shields therefore cannot relitigate

3    the validity of the waiver in these § 2255 proceedings.

4        Moreover, Shields' assertion that the waiver of his personal appearance was involuntary is

5    completely unsupported by the record. Shields states in his Reply that "According to counsel

6    Nolan the waiver would allow Nolan to properly represent Mr. Shields at all of the preliminary

7    proceedings without Nolan having to continually work with the Court and the Marshals to

8    get them to organize and pay for the travel from Petitioner's home in North Carolina to the

9    Northern District of California." Reply at 15, ECF 523. While Shields argues after the fact that

10   he was pressured into signing the waiver by Mr. Nolan, and that he wanted to attend the loss

11   hearing, those arguments are at odds with the contents and tone of the letter Shields wrote Mr.

12   Nolan immediately prior to the loss hearing. As noted above, Shields made no mention in the

13   letter of his desire to attend the loss hearing, nor does the letter give any indication that Shields

14   was unhappy with Mr. Nolan in any respect. *See* Email, Exhibit D to Shields' Reply, ECF 523-4.

15   The email began as follows: "Tom, Since I am not coming to the hearing I wanted to put down

16   some thoughts about the loss figures that may be useful in the loss hearing. . . . Thanks for your

17   help!" *Id.* Shields then spent three single-spaced pages describing the financial transactions at

18   issue and his view that his own actions were blameless. *See id.* Shields concluded the email by

19   stating, "I hope this is not overwhelming but these are the facts of what actually happened. . . .

20   Thanks for all you are doing, Rusty." *Id.* In his Reply, Shields states that other emails between

21   himself and Mr. Nolan would prove that the waiver was involuntary. *See* Reply at 17, ECF 523.

22   However, Shields has not attached any such emails, nor has he explained why he could not have

23   done so when he was able to attach the email discussed above.

24       Even if Shields could establish that Mr. Nolan was deficient in failing to ensure Shields'

25   presence at the loss hearing, Shields has not established resulting prejudice. Shields argues that

26   Mr. Nolan did a poor job of rebutting the Government's evidence at the hearing, and that if

27   Shields had been present the outcome would have been better for him. However, that argument is

28   entirely speculative. Mr. Nolan worked with co-counsel, Ms. Kieval, to prepare the opposition to

34

the Government's loss calculation. *See* Nolan 302 at 7, Exh. C to Opp., ECF 497-3. Mr. Nolan

filed a written brief citing the applicable law and setting forth calculations to support a

determination of loss attributable to Shields in the range of $847,261.00 to $1,424,443.98. *See*

Def.' Brief re Loss Figure, ECF 300. Those figures are substantially lower than the $9,933,208.65

loss figure argued by the Government and the $6,353,975.13 loss figure ultimately determined by

Judge Whyte. *See* Gov't Brief re Loss Figure, ECF 296; Court's Loss Calculation, ECF 320. The

hearing transcript reflects that Mr. Nolan argued that the losses did not result from a scheme to

defraud, but rather from optimistic expectations and economic conditions. *See* Loss Hrg. Tr. 18:1-

19:12, 23:9-25:6, ECF 416. Mr. Nolan also argued that the Court should not consider conduct for

which Shields had not been convicted as relevant conduct for purposes of the loss calculation. *See*

Loss Hr. Tr. 19:13-20:24, 27:1-8, 36:10-37:6.

The positions taken by Mr. Nolan at the loss hearing are the same positions taken by

Shields throughout his briefing on the present § 2255 Motion. *See, e.g,* Memorandum at 1 ("The

government is actually and factually just plain wrong regarding their theory and conclusions of

Shields' involvement in any scheme to defraud."); Memorandum at 1 ("The government's false

theory of fraud is pure fantasy that exists no where in the evidence."); Memorandum at 2 ("There

was never a 'scheme to defraud' as the government claims."; Reply at 19 (complaining that he

received a "relevant conduct enhancement that was based on clearly erroneous findings of

fact"). Shields' belief that Mr. Nolan would have argued those positions more effectively had

Shields been present at the loss hearing is nothing more than that – his belief.

Indeed, with respect to Shields' assertion that Judge Whyte improperly considered losses

from the projects that did not form the bases for Shields' conviction, the law is clear that acts that

are part of the same scheme as the offense of conviction may be considered as relevant conduct

when determining the loss amount for purposes of sentencing. *See United States v. Horob*, 735

F.3d 866, 872 (9th Cir. 2013) ("Relevant conduct is defined as 'part of the same course of conduct

or common scheme or plan as the offense of conviction.' (quoting U.S.S.G. § 1B1.3(a)(2)).

Additionally, Shields fails to acknowledge that his offense level would have been the same for any

loss amount above $2,500,000. *See* U.S.S.G. 2B1.1(b)(1)(j) (2014) (providing for an 18-level

increase for a loss that is between $2,5000,000 and $7,000,000).  In order for Shields to receive a lower offense level, Judge Whyte would have had to reduce his loss amount by more than $3.8 million.  Shields has not provided any basis for concluding that, had he been present at the loss hearing, Judge Whyte would have reduced the loss amount attributable to Shields at all, let alone by $3.8 million.

Claim 4(4) is DENIED.

### 7. Sentencing Hearing (Claim 4)

In Claim 4(5), 4(6), and 4(7), Shields argues that Mr. Nolan made several missteps at the sentencing hearing, rendering his representation deficient.  *See* § 2255 Motion at 9, ECF 462.  In Claim 4(5), Shields argues that Mr. Nolan failed to request a downward departure for time served.  *Id*.  In Claim 4(6), Shields argues that Mr. Nolan improperly had the record stricken to remove Shields' $500,000 contribution from the Presentence Report.  *Id*.  And in Claim 4(7), Shields argues that Mr. Nolan failed to move the Court for an acquittal notwithstanding the verdict at the sentencing hearing.  *Id*.

With respect to Shields' assertion that Mr. Nolan was ineffective for failure to request a downward departure for time served, the "time served" in question is the period Shields spent on pretrial home confinement.  *See* Reply at 105, ECF 523.  Mr. Nolan informed the Court at the sentencing hearing that Shields had been on electronic monitoring for two and a half years.  Sentencing Hrg. Tr. 139:9-17, ECF 388.  The Government's counsel stated the Government's position that Shields should not receive any benefit from having been on electronic monitoring.  *Id*. at 142:6-17.  Shields asserts that Judge Whyte nevertheless was receptive to a motion for downward departure, and in Shields' view "appeared to be waiting for Nolan to make a request" for a downward departure.  Reply at 105, ECF 523.  Mr. Nolan stated in his FBI interview that he did not make a motion for downward departure based on the period of electronic monitoring because he had made such motions before Judge Whyte in the past and he knew Judge Whyte would not grant the downward departure.  Nolan 302 at 5, Exh. C to Opp., ECF 497-3.  Given Mr. Nolan's past experience with Judge Whyte, he reasonably could have believed that a motion for downward departure would not be successful.  Moreover, any assertion of prejudice is speculative,

36

as there is no reason to believe that Judge Whyte would have granted a downward departure based on the period of electronic monitoring. The United States Sentencing Guidelines do not provide for downward departure based on electronic monitoring. *See* U.S.S.G. § 2B1.1, comment n. 21(C) and (D); § 4A1.3, comment n. 3.

With respect to Shields' contention regarding the contents of the Presentence Report, Mr. Nolan informed Judge Whyte at the sentencing hearing that the Presentence Report had an error, as it reflected a $5,000 contribution by Shields when the actual amount of Shields' contribution was $500,000. *See* Sentencing Hrg. Tr. 138:20-139:7, ECF 388. Mr. Nolan stated that the error was his mistake, not that of the probation officer, and he asked that the figure simply be stricken rather than corrected to reflect a $500,000 contribution. *See id.* Mr. Nolan stated that correcting the Presentence Report "requires a whole lot more of explanation and I would just rather not deal with it." *See id.* In his Reply, Shields describes a conversation in which Mr. Nolan allegedly suggested that it would be difficult to explain to the Court where Shields got the $500,000 he was claiming to have contributed. *See* Reply at 106, ECF 523. Shields asserts that it would have been a simple matter for Mr. Nolan to show that Shields contributed $500,000 that was never returned to him, and then embarks on a convoluted explanation of why the $500,000 should have been credited to him personally. *See id.* at 106-08. It is not clear from this record why Mr. Nolan felt that it was better not to try to explain the $500,000 contribution to Judge Whyte. However, in order to demonstrate that Mr. Nolan's decision constituted deficient performance, Shields must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Shields' contention that Mr. Nolan should have pursued the contribution issue, against the backdrop of Shields' conviction on 32 counts of financial misconduct, does not suffice.

With respect to Shields' contention that Mr. Nolan should have made a motion at the sentencing hearing for an acquittal notwithstanding the verdict, the record reflects that the defense made four separate motions for acquittal which were denied on September 22, 2014, the day before the loss hearing. *See* Order on Motions for Acquittal or New Trial, ECF 313; Corrected Order on Motions for Acquittal or New Trial, ECF 314. At his FBI interview, Mr. Nolan stated

1    that he was unaware of any change in circumstance between the Court's denial of those motions

2    on September 22, 2014 and the sentencing hearing on November 17, 2014.  Nolan 302 at 5, Exh.

3    C to Opp., ECF 497-3.  Mr. Nolan therefore did not believe that another motion for acquittal

4    would be well-received.  *See id.*  Shields has failed to show that Mr. Nolan's choice not to file a

5    fifth motion for acquittal constituted deficient representation or that Judge Whyte would have

6    granted such a motion.

7              Claims 4(5), 4(6), and 4(7) are DENIED.

8         **D.      Motion for Evidentiary Hearing**

9              As discussed above, an evidentiary hearing is required only if:  (1) the § 2255 movant

10   alleges "specific facts which, if true, would entitle him to relief"; and (2) "the petition, files and

11   record of the case cannot conclusively show that he is entitled to no relief."  *Howard*, 381 F.3d

12   877.  A hearing is not required if expansion of the record before the district court is sufficient to

13   allow resolution of the questions presented by a § 2255 motion.  *Rodriguez-Vega*, 797 F.3d 791

14   (district court did not abuse its discretion in failing to conduct an evidentiary hearing where

15   expanded record provided adequate basis to resolve IAC claim).

16             In the present case, the Court concludes that the briefing and the record, as expanded to

17   include the Nolan 302, Shields' declaration, and other evidence discussed herein, conclusively

18   show that Shields is entitled to no relief.  The Ninth Circuit has affirmed the denial of an

19   evidentiary hearing in numerous cases involving similar charges and/or claims.  *See, e.g., United*

20   *States v. Harrell*, 545 F. App'x 635, 637 (9th Cir. 2013) ("The district court made logical and

21   plausible inferences from the record in determining that Harrell's claims were not sufficient to

22   warrant an evidentiary hearing" in case involving wire fraud, conspiracy to launder money, and

23   money laundering.); *United States v. Roberson*, 374 F. App'x 728, 730 (9th Cir. 2010) (district

24   court did not abuse its discretion in denying evidentiary hearing on IAC claims brought by

25   defendant convicted of bankruptcy fraud, loan fraud, securities fraud, and money laundering);

26   *United States v. Hafoka*, 312 F. App'x 77, 77 (9th Cir. 2009) ("Hafoka has failed to satisfy the

27   standard which would warrant an evidentiary hearing on his ineffective assistance claims.").

28             Shields' motion for an evidentiary hearing is DENIED.

1

**E.** **Certificate of Appealability**

2

A movant may appeal a district court's dismissal of a § 2255 motion only after obtaining a

3

certificate of appealability from the district court or the circuit court. 28 U.S.C. § 2253(c)(1)(B).

4

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing

5

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard is satisfied if

6

"jurists of reason could disagree with the district court's resolution of [the] constitutional claims"

7

or "conclude the issues presented are adequate to deserve encouragement to proceed further."

8

*Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

9

(2000)). Under this standard, the Court concludes that Shields is not entitled to a certificate of

10

appealability. No reasonable jurist would find debatable Shields' failure to demonstrate

11

entitlement to relief on the claims presented in his § 2255 Motion.

12

**IV.** **ORDER**

13

(1) Defendant's § 2255 Motion is DENIED;

14

(2) Defendant's Motion for An Evidentiary Hearing is DENIED;

15

(3) Defendant's Motion to Supplement the Record is GRANTED;

16

(4) The Government shall file the Government's Supplemental Excerpts of Record

17

(Volumes 1-14) in this case;

18

(5) This order terminates ECF 462 and 525 in Case No. 12-cr-00410; and

19

(6) The Clerk shall file this order in Case No. 17-cv-03978-BLF and close that case.

20

21

Dated: January 21, 2020

22

23

BETH LABSON FREEMAN
United States District Judge

24

25

26

27

28